R. H. MACY & CO., INC., *vs.* CITY OF FALL RIVER
(and five companion cases[1]).

Bristol.    October 25, 1948. — February 3, 1949.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

*Landlord and Tenant,* Heat, Exemption from liability.  *Contract,* To furnish
heat, Performance and breach.

A city, if it had power to subject itself to a contract to furnish heat in a
mill, was liable for damages resulting from failure to do so only so far
as it violated express terms of the contract; no broader duty in that
respect arose by implication.

In a lease, given previous to the effective date of § 15, added to G. L.
(Ter. Ed.) c. 186 by St. 1945, c. 445, § 1, a provision that the lessor
should "not be held liable for any damage done or occasioned . . .
from plumbing . . . water, steam . . . or other pipes . . . or the
bursting, leaking or running of any pipes," exempted the lessor from
liability for damage sustained by the lessee from the freezing and
bursting of sprinkler pipes due to the lessor's failure to perform a cove-
nant respecting heating.

Evidence at the trial of an action for alleged failure to perform a covenant
"to furnish sufficient heat to reasonably heat . . . [a mill building]
in accordance with the proper or customary use of such building,
between the hours of 7 A.M. and 10 P.M. on each week day," left it
conjectural whether freezing and bursting of sprinkler pipes and conse-
quent damage to the plaintiff occurred as the result of failure to fur-
nish heat to the extent required by the covenant at times when there
was a duty to furnish it or as the result of failure to furnish heat at
times when there was no duty to furnish it.

SIX ACTIONS, two in tort and four in contract or tort.
Writs in the first action dated November 2, 1943, and in
the others dated May 5, 1944.

The actions were tried together before *Murray,* J.

*C. A. Adams,* (*G. Walsh & H. M. Siskind* with him,) for
the plaintiffs.

*J. T. Farrell,* Corporation Counsel, (*R. G. Desmarais,*
Assistant Corporation Counsel, with him,) for the defendant.

[1] The companion cases are by Cape Cod Shirt Company, F. R. Knitting
Mills, Inc., Harmon Realty & Trading Corp., Greenwelk Knitwear Co., Inc.,
and Avon Curtain Corp. against the same defendant.

QUA, C.J.   These six actions are all brought to recover for damage to property caused on December 22, 1942, by water released from a sprinkler pipe which froze and broke in "Wampanoag Mill No. 2" at Fall River.   All the actions except those of R. H. Macy & Co., Inc., and Greenwelk Knitwear Co., Inc., were tried as actions in contract or tort. The Macy and Greenwelk actions were tried as actions in tort only.

Some time before October 20, 1942, the city had acquired title to the mill by foreclosure of its tax lien and had leased different floors of the building respectively to the plaintiffs Cape Cod Shirt Company, F. R. Knitting Mills, Inc., and Avon Curtain Corp.   Each lease was in effect in December, 1942, and each contained a covenant by the lessor (the city) "to furnish sufficient heat to reasonably heat the said premises in accordance with the proper or customary use of such building, between the hours of 7 A.M. and 10 P.M. on each week day."   Each lease also contained a covenant by the lessee that the lessor should "not be held liable for any damage done or occasioned . . . from plumbing, . . . water, steam, . . . or other pipes . . . , or the bursting, leaking or running of any pipes . . . ."   The heating was by means of steam supplied through pipes from another mill some distance away which had also been acquired by the city.   On October 20, 1942, the city conveyed "Wampanoag Mill No. 2" to the plaintiff Harmon Realty & Trading Corp., "subject to" the leases, and at the same time executed an agreement with that plaintiff which contained a covenant to supply heat to the mill, framed in substantially the same language as the covenants in the leases, except that it should be in force until May 1, 1950, or until the Harmon corporation should provide heating facilities on the premises, and that the corporation should pay the city $3,500 a year. This agreement contained no provision by which the Harmon corporation agreed that the city should not be held liable for any damage occasioned by water or the bursting or leaking of pipes.   The Macy and Greenwelk companies, which were neither lessees nor grantees of the real estate, base their claims solely upon damage to stock belonging to

them which they had turned over to two of the lessees respectively to be manufactured into finished goods. It is conceded that the rights of these plaintiffs rise no higher than those of the lessees. For purposes of this opinion we may assume, but without deciding, that these plaintiffs can recover if the lessees can.

In each case the trial judge directed a verdict for the defendant. The cases are here on report. In each case the question is whether a verdict was rightly directed for the defendant.

The conveyance by the defendant to the Harmon corporation did not relieve the defendant from its obligations to the lessees on the leases. *Jones* v. *Parker*, 163 Mass. 564, 568. *Carpenter* v. *Pocasset Manuf. Co.* 180 Mass. 130, 133–134. *Neal* v. *Jefferson*, 212 Mass. 517, 521–522. *Bickford* v. *Dillon*, 321 Mass. 82, 83. But, whether the claims of the several plaintiffs are in contract or in tort, the obligations of the defendant in respect to heating spring from, and are necessarily defined by, the precise provisions of the leases and the agreement. *McElroy* v. *Nashua & Lowell Railroad*, 4 Cush. 400, 403. *Squire* v. *Western Union Telegraph Co.* 98 Mass. 232, 236–237. *Wiley* v. *Bunker Hill National Bank*, 183 Mass. 495, 496. *Miles* v. *Boston, Revere Beach & Lynn Railroad*, 274 Mass. 87. *Tefft* v. *Boston Elevated Railway*, 285 Mass. 121, 124. *Abrams* v. *Factory Mutual Liability Ins. Co.* 298 Mass. 141, 144. *Lakube* v. *Cohen*, 304 Mass. 156, 159. See *Bryant* v. *Rich*, 106 Mass. 180, 188–189; *Vannah* v. *Hart Private Hospital*, 228 Mass. 132. Compare *Tuttle* v. *George H. Gilbert Manuf. Co.* 145 Mass. 169; *Bickford* v. *Richards*, 154 Mass. 163. In the face of express provision there is no room for the implication of any broader duty than that expressed.

It is difficult to see how the defendant can be held liable to any of the lessee plaintiffs, or to the plaintiffs whose material was in the lessees' possession, in view of terms of the leases that the lessor shall not be held liable for any damage done or occasioned from plumbing, water, steam, or other pipes, or the bursting, leaking or running of any pipes. *Fera* v. *Child*, 115 Mass. 32. *Henry H. Tuttle Co.* v. *Phipps,*

219 Mass. 474.   *J. W. Grady Co.* v. *Herrick,* 288 Mass. 304.
*American Sandpaper Co.* v. *Waltham Factories, Inc.* 299
Mass. 369.   *Malden Knitting Mills* v. *United States Rubber
Co.* 301 Mass. 229.   The cases at bar are not governed by
*Smith* v. *Faxon,* 156 Mass. 589, at pages 596–597, where the
clause exempting the defendant from liability was construed
not to refer to torts committed by the lessor as the owner of
adjoining land.   Here the damage was necessarily of the
very kind as to which it was intended that the lessor should
be protected.   Nor are these cases affected by G. L. (Ter.
Ed.) c. 186, § 15, added by St. 1945, c. 445, § 1, since, if
otherwise applicable, that statute does not apply to leases
entered into before its effective date.   § 2.

We are of opinion, moreover, that none of the plaintiffs,
including the Harmon corporation, was entitled to go to the
jury for the comprehensive reason, applicable alike to all
the plaintiffs, that the evidence would not warrant a find-
ing that the damage was caused by failure of the defendant
to perform its covenant to furnish heat as defined in the
leases and in the agreement of October 20, 1942.   The
pertinent evidence is related to a period of about three days
from Saturday, December 19, to Tuesday, December 22.
This appears to have been a period of extreme cold weather
for Fall River.   The only evidence of failure to furnish heat
during this period was that on Saturday and Sunday "there
was no heat at all"; that on Monday "the temperature
around the plant 'must have been around 40 or 42°,' " and
it was so cold that the employees did not work, but that
"heat began to come up that afternoon"; that the em-
ployees worked the next day, Tuesday; that the flow of
water was first discovered between seven and eight o'clock
Tuesday night; and that the premises were then "awful
cold."   A person in charge of the weather bureau testified
that on Saturday the outside temperature was ten degrees
above zero at 8 A.M. and seven degrees at 8 P.M., with a
maximum for the day of seventeen degrees and a minimum
of four degrees; that on Sunday the temperature was zero
at 1 A.M., reached a minimum of twelve degrees below zero
at 6 A.M., a maximum of seven degrees above at 4 P.M., and

was two below zero at midnight; that the mean tempera-
ture for that Sunday was two and one half degrees below
zero; that on Monday it was six degrees below zero at
7 A.M., rose to eight degrees above by 7 P.M., and dropped
again to two degrees above at midnight; and that on Tues-
day it was fourteen degrees above at 8 A.M., twenty-eight
degrees at noon, and had risen to thirty-seven degrees by
8 P.M., about the time the leak was discovered.

The defendant was under no obligation to furnish any
heat at all from ten o'clock Saturday night until seven o'clock
Monday morning. This period of thirty-three hours in-
cluded the coldest part of the three days, the thermometer
being below zero, according to the weather observer, during
all but about nine hours of this time. The lowest tempera-
ture was twelve degrees below zero and the highest seven
degrees above. We see no reason to believe that the freezing
took place on Saturday, when the thermometer outside did
not go below zero at all, rather than on Sunday, when the
weather was considerably colder. Neither is there any
particular reason to believe that the freezing occurred dur-
ing the day Monday, while there was an obligation to fur-
nish heat. So far as the evidence discloses, the inside
temperature was about ten degrees above freezing on Mon-
day, and the heat "began to come up" that afternoon. If
the freezing occurred Monday night, again the defendant
was not required to furnish any heat at that time. On
Tuesday the employees were working once more, and the
weather moderated rapidly. There was no evidence as to
the heat retaining qualities of the building except that it was
of mill construction; that it was a stone building; and that
the walls were brick, whatever that may mean. There was
no evidence that failure to heat on Saturday would result
in freezing before 10 P.M., or that heating on Saturday to
the extent required by the covenants would have prevented
freezing on Sunday. There was no evidence of "the proper
or customary use" of the building on Saturdays. So far
as appears it may not have been customary to work on
Saturdays, and under the terms of the covenants little or
no heat may have been required on those days. There was

no covenant to furnish heat enough at all times to prevent freezing. At best, it seems to us conjectural whether the freezing occurred as the result of failure to furnish heat to the extent required by the covenants at times when there was a duty to furnish it or of failure to furnish heat at times when there was no duty to furnish it. We do not see how the difficulty could have been overcome if the jury had believed part of the evidence and disbelieved other parts.

Because of the view we have taken of the evidence it becomes unnecessary to consider the defendant's contention that, as a municipality, it had no power to contract to furnish heat.

In each case the entry will be

*Judgment for the defendant.*