Thomas, Appellant, *v.* Metropolitan Life Insurance Company.

500 

Argued January 10, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

 

 reargument refused April 17, 1957.

*Samuel J. Goldstein,* with him *Herbert R. Jacobson,* for appellant.

*William H. Eckert,* with him *Alexander Black* and *Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for appellee.

OPINION PER CURIAM, March 25, 1957:

We are in accord with the determination of this action in assumpsit and the judgment entered in favor of the defendant is affirmed on the following portion of the able opinion of Judge LEWIS:

"This matter comes before the court en banc on the plaintiff's motion for judgment on an agreed set of facts.

"The defendant company issued a life insurance policy in the face amount of $5,000 on the life of Francis R. Thomas, Jr., effective February 28, 1948.

"His father, Francis R. Thomas, Sr., plaintiff in this action, was named beneficiary.

"The policy contained an accidental death benefit clause providing for an additional $5,000 payment ('. . . upon receipt at the Home Office of due proof of death of the Insured, while this provision is in effect, as the result, directly and independently of all other causes, of bodily injuries caused solely by external, violent, and accidental means, and that such death shall not have occurred . . . as a result of an act of war.')

"The facts disclose that the Insured became a private in the United States Marine Corps and was killed in Korea on October 27, 1952, while he was attempting to single-handedly storm a series of bunkers and trenches occupied by enemy troops. His immediate death was brought about by being struck with an enemy hand grenade.

"On receiving proof of death of the Insured, the defendant company paid the face amount of the policy, but they refused to pay double indemnity, because they contended that the Insured was killed 'as a result of an *act of war.*'

"The plaintiff contends the Insured was not killed by an 'act of war' because no war existed between the United States and any other nation. While the plain-

tiff's counsel admits that the struggle in Korea involved armed conflict between a group of nations, yet he argues it could not be considered a war, because the United States had not formally declared war on the North Koreans or the Chinese Communists.

"In support of this argument, the plaintiff cites the recent case of *Julia Beley v. Pennsylvania Mutual Life Insurance Company, a Corporation,* 373 Pa. 231.

"We must first determine then what we mean by the term 'war'.

"While the generally accepted meaning of the word 'war' is an armed conflict between two nations, according to the various opinions handed down by the many courts throughout the land, the legal interpretation of the word 'war' is not as simple as it would seem. Beginning with the earliest cases, there has been a marked conflict, not only between the different courts, but between judges of the same court, as to the legal interpretation of the word 'war'.

"In our own state of Pennsylvania, in the *Julia Beley* case, supra, four justices interpreted 'war' to mean one thing and two others gave it an entirely different meaning.

"This difference of opinion is largely due to the fact that the courts from the earliest days recognized that wars fall into one of two classifications. They are either declared or undeclared.

"In the case of *Bas v. Tingy, Supreme Court,* 1800, 4 Dallas 37, which is one of the earliest cases on the subject, the court points out there may be two kinds of wars which a nation might become engaged in:—a declared or solemn war, or an undeclared or imperfect war.

"The Court, in discussing the definition of the word 'war', said: 'It may, I believe, be safely laid down, that every contention by force between two nations, in ex-

ternal matters, under the authority of their respective governments, is not only war, but public war. If it be declared in form, it is called solemn, and is of the perfect kind; because one whole nation is at war with another; and all the members of the nation declaring war are authorized to commit hostilities against all the members of the other, in every place, and under every circumstances. In such a war all members act under a general authority and all the rights and consequences of war attach to their condition.'

'But hostilities may subsist between two nations more confined in their nature and extent; being limited as to places, persons and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission. Still, however, it is public war, because it is an external contention by force, between some of the members of the two nations, authorized by the legitimate powers. It is war between the two nations, though all the members are not authorized to commit hostilities such as in a solemn war, where the government restrains the general power.'

"The *Eliza Ann* case, 1 Dodson 244, decided in the High Court of Admirality, Great Britain in 1833, stands for the proposition that there may be a war between two countries without having a declaration on either side.

"In the famous *Prize Cases*, United States Supreme Court, 1862, 2 Black 635, arising out of the Civil War, the majority opinion concurred in by five justices stated that the Civil War was a war and the belligerents engaged in actual warfare were entitled to have their rights protected under International Law even though the Government of the United States had not declared war.

"The majority opinion stated: 'A civil war is never solemnly declared; it becomes such by its accidents—the number, power and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war.'

"The minority opinion in which four justices concurred stated: 'But before this insurrection against established government can be dealt with on a footing of civil war, within the meaning of the law of nations and the Constitution of the United States and which will draw after it belligerent rights it must be recognized or declared by the war making power of the government. No power short of this can change the legal status of the government or the relations of its citizens from that of peace to a state of war, or bring into existence all those duties and obligations of neutral third parties growing out of a state of war.'

"In the case of *Hamilton v. McClaughry,* 136 Fed. 445, the court held that the Boxer Rebellion in 1900 was a war, although history books have continually referred to it as a rebellion. The court said that a war can be entered into by a sovereign or between sovereign nations without the necessity of a formal declaration.

"In the case of *Arce v. State,* 202 S. W. 951, the Criminal Court of Appeals of Texas held that the controversy between the United States and Mexico in 1916 constituted war although war had not been declared. The court said: 'While the invasion of Mexico by Gen. Pershing's column was not a public or complete war, or not preceded by a declaration of war against Mexico by the United States, *it was an act of war* and under

the definitions given by Gen. Crowder and the authorities generally it was technically and within the limited meaning of the word "war".' (Emphasis supplied)

"One of the later cases on the subject and which is considered one of the leading cases is the case of *New York Life Insurance Company v. Bennion,* 158 F. 2nd 260. In that case, the insured was in command of the Battleship West Virginia and was killed at his post of duty during the Japanese attack of December 7, 1941 at Pearl Harbor.

"The New York Life Insurance Company had a life insurance policy on the insured with double indemnity for accidental death to the insured, but excluded from its coverage death resulting from war or any act incidental thereto.

"The company denied liability for double indemnity arguing that whether a country was engaged in war is a question of fact, not to be determined by what Congress has done or not done, but by the fact of whether or not the country was engaged in a shooting war.

"The Circuit Court of Appeals upheld this contention and stated the exemption was applicable on the ground that war in the grim sense of reality did exist on December 7, 1941 at Pearl Harbor and the parties must have intended such effect from the exclusion clause.

"There was a strong dissenting opinion filed in this case . . .

"While we have seen that some of our cases have held that war may exist without a declaration by Congress, a great number of cases have held that the judicial can only take cognizance of authoritative acts of the political or legislative with respect to war. These cases hold it is not for the courts to determine whether or not a war exists by judicial legislation.

"One of the cases that clearly states this view and which has been quoted many times by other courts is the case of *Bishop v. Jones,* 28 Texas 294. The Court at page 319 states as follows: 'War in its legal sense has been aptly defined to be the state of nations among whom there is an interruption of all pacific relations and a general contestation of arms authorized by the Sovereign. It is true it may and has frequently in latter times been commenced and carried on without either a notice or declaration. But still there can be no war by its government of which the court can take judicial knowledge, until there has been some act or declaration creating or recognizing its existence by the department of the government clothed with war making power.'

"It was also stated in the same case: 'War does not exist merely on the suspension of the usual relations of peace. Commerce may be interdicted without producing it. Reprisals and embargoes are forcible measures of redress, but do not per se constitute war. Hostile attacks and armed invasions of the territory or jurisdiction of a nation accompanied by the destruction of life and property by officers acting under the sanction and authority of their government however great and flagrant provocation to war are often atoned for and adjusted without it ensuing.'

"This same reasoning was used by the courts in the following cases:

"*Rosenau v. Idaho Mutual Beneficial Association,* 145 Pac. 227, although there again there was a very strong dissenting opinion filed in which two judges took the opposite view of the interpretation of the word war; *West v. Palmetto State Life Insurance Company,* 35 S. E. 2nd 475; *Pang v. Sun Life Assurance Company,* 14 C. C. H. Life Reports 496; 37 Hawaiian Reports 208; *Savage v. Sun Life Assurance Company of*

*Canada*, 57 F. Supp. 620; *Hamilton v. Kentucky Distilleries Company*, 251 U. S. 146; *United States v. Anderson*, 76 U. S. 56; *Greenville Enterprises v. Jennings*, 41 S. E. 2nd 868, 210 S. C. 163; *Mutual Life Insurance Company v. Davis*, 79 Georgia App. 340; *Boston v. Stoneham*, 323 Mass. 626.

"Out of nine serious and extended engagements of force against other nations which our nation became involved in, four were conducted without Congress declaring war at all. The engagements which took place without any Congressional declarations are: The undeclared naval war with France 1798-1800. (This engagement was referred to as an imperfect war, because not solemnly declared in *Bas v. Tingy*, United States Supreme Court, 1800, 2 Dallas 37). The First Barbary War 1801-05; the Second Barbary War 1815 and the American Mexico Hostilities 1914-17. (These hostilities were declared a war in the case of *Arce et al. v. State, Court of Criminal Appeals of Texas*, 202 S. W. 951). The engagements where war was declared are: The War of 1812; the Mexican War and the First and Second World Wars. (See Rogers J. C. World Policing and the Constitution, Boston World Peace Foundation 1945, pp. 45 ff).

"It will be noted that the above engagements of force against other nations without a formal declaration of war by Congress have been referred to by the term War by our historians and our courts.

"It becomes very clear then that hostilities between nations can become war whether solemnly declared or not. War of the perfect kind, solemnly declared, is called declared war. War of the imperfect kind that has not been baptized with a name by Congress is known as undeclared war.

"The majority opinion in the case of *Julia Beley v. Pennsylvania Mutual Life Insurance Company, a Cor-*

*poration,* supra, on which the plaintiff relies, while contending that 'war' as used in the policy means a formally declared war by Congress, recognized the fact, however, that there are two kinds of wars, declared and undeclared.

"In permitting a recovery on the policy in the *Beley* case, for the death of the insured in Korea while a member of the armed forces, for the face amount of the policy and double indemnity, under a policy which contained a clause limiting recovery to the return of premiums if the insured engaged in military or naval service in the time of war, the court said: 'The action being waged in Korea is not a "war" within what may be termed the constitutional or legal sense of that term.'

"It is apparent from reading the opinion of the majority that the court recognized the fact that there were two kinds of war but in interpreting the language contained in the insurance policy they decided that it must be given its constitutional or legal meaning or otherwise the court would be utterly at sea whenever a question arose as to whether certain expeditions in which the United States forces were engaged constituted a war.

"The court concluded in the *Beley* case that if the insurance company intended that 'war' should have a broader connotation than its constitutional or legal intendment, it merely had to add to the term 'war' in the contract, 'declared or undeclared'.

"Since the *Beley* case, supra, and its companion case, *Harding v. Pennsylvania Mutual Life Insurance Company,* 373 Pa. 270, 171 Pa. Sup. Ct. 236, were decided, similar cases in other jurisdictions have been decided, which held that the conflict in Korea was a war within the meaning of an insurance clause excluding death from war. *Western Reserve Life Insurance*

*Company v. Meadows,* 152 Texas 559, 261 S. W. 2nd 554; *Langlas v. Iowa Life Insurance Company,* 245 Ia. 713; *Gudewicz v. John Hancock Mutual Life Insurance Company,* 122 N. E. 2nd 900 (Mass. 1954); *Gagliormella v. Metropolitan Life Insurance Company,* 122 F. Supp. 246 (Mass. 1954); *Carius v. New York Life Insurance Company,* 124 F. Supp. 388 (Ill. 1954); *Christensen v. Sterling Insurance Company,* 284 P. 2d 287 (Wash. 1955).

"These cases all have adopted the view that war existed in Korea because the armies of nations were in armed conflict and therefore war existed.

"The Supreme Court of Pennsylvania, while admitting that war in the generally accepted sense did .exist, was more concerned with the proper interpretation of the war exclusion clause in the insurance contract, which was the real issue in the *Beley* case.

"Finding that the term 'war' for over one hundred fifty years has been classified as declared or undeclared by the various courts throughout the nation, they concluded that the term 'war' was ambiguous and should be most strongly construed against the insurance company, whose lawyers drafted the contract.

"In so doing, they concluded that war must be construed in its constitutional and legal sense, which means a formally declared war by Congress.

"The learned Judge DITHRICH of the Superior Court, who wrote the opinion in the *Harding* case, supra, which was affirmed by the Supreme Court of Pennsylvania, had this to say: 'Since "war" is a word which has been held to import various meanings, it is incumbent upon the insurer to make clear that it applies to undeclared war, as well as to declared war, for even if the action in Korea should be held to be war, it is at most an undeclared war.'

"It is our opinion that the reasoning of the Supreme Court in the *Beley* and *Harding* cases, supra, was not only logical and clear, but the result just.

"Furthermore, we are bound by the decision and must accept the term 'war' in its constitutional and legal sense to mean a formally declared war by the authorities authorized to declare war, unless it has been so characterized to impart an entirely different meaning.

"In the instant case, however, the plaintiff's right of recovery rises or falls on the legal interpretation of the phrase, '*act of war*'. If the Insured came to his death as a result of an 'act of war', plaintiff beneficiary cannot recover in the instant case.

"If the term 'act of war' is also an ambiguous term and has two or more meanings, it would have to be interpreted most strongly against the defendant insurance company, who drew the contract. *Ebbert v. Philadelphia Electric Co.*, 330 Pa. 257.

"The plaintiff contends the phrase, 'act of war', as referred to in the policy, refers to an act pertaining to a formally declared war, and as the Supreme Court in the *Beley* case has decided the Korean conflict was not a war, not being formally declared, the clause excluding recovery by reason of death caused by an act of war, does not prevent recovery in this case.

"It is our opinion, however, that the term 'act of war' is not an ambiguous term. It has been used many times in connection with the description of an attack by the armed forces of one nation against the armed forces of another. It has been used in connection with the attack by the armed forces of one nation against the civilians of another; and it has been used in connection with the invasion of the territory of one nation by the armed forces of another.

"These hostile attacks may occur without war being declared formally or informally, and without either country recognizing the existence of a state of war.

"As was stated in the early case of *Bishop v. Jones,* 28 Texas 294: 'Hostile attacks and armed invasions of the territory or jurisdiction of a nation accompanied by the destruction of life and property by officers acting under the sanction and authority of their government however great and flagrant provocation to war are often atoned for and adjusted without it ensuing.'

"Hostile attacks of this kind from time immemorial have been referred to as 'acts of war'. They are acts, which, under International Law, would justify the nation, whose citizens or armed forces were attacked, or whose territory was invaded, in declaring war on the aggressor nation.

"In Moore's Digest of International Law, we find the following quotations: 'Much confusion may be avoided by bearing in mind the fact that by the term war is meant not the mere employment of force, but the existence of the legal condition of things in which rights are or may be prosecuted by force. Thus, if two nations declare war one against the other, war exists, though no force whatever may as yet have been employed. On the other hand, force may be employed by one nation against another, as in the case of reprisals, and yet no state of war may arise. In such a case there may be said to be an act of war, but no state of war. The distinction is of the first importance, since, from the moment when a state of war supervenes third parties become subject to the performance of the duties of neutrality as well as to all the inconveniences that result from the exercise of belligerent rights.'

"It was held by the Criminal Court of Appeals of Texas in *Arce et al. v. State,* supra, that although there was no declaration of war against Mexico by the Unit-

ed States, the invasion of Mexico by General Pershing's column was an act of war.

"Very few of the world's conflagrations of war have been set off by formal declarations of war.

"History reveals that most of the major holocausts of war have been primed by a sneak attack by the armed forces of one nation against the armed forces or civilians of another.

"The sinking of the Lusitania by a German submarine was one of a series of acts of war which preceded the declaration of war by the United States Congress in 1917.

"In declaring war on Germany, April 6, 1917, the joint resolution of Congress said: 'Whereas the Imperial German Government has committed repeated acts of war against the Government and the people of the United States of America,'

"It was accordingly resolved: 'that the state of war between the United States and the Imperial German Government which has thus been thrust upon the United States is hereby formally declared.' 40 Stat. 1.

"The sinking of the Maine in Havana Harbor in 1898 was an act of war, which triggered the opening of hostilities with Spain and culminated in the Spanish-American War.

"The bombing of the United States Gunboat 'Panay' by the Japanese on the Yangtze River in China was an act of war, which did not result in the existence of a state of war between the United States and Japan.

"The bombing of Rotterdam, without warning, by the German Air Force in May, 1940, was an act of war preceding the invasion of Holland.

"The bombing of Warsaw by the German Air Force in September, 1939, was an act of war preceding the invasion of Poland.

"The bombing of Pearl Harbor by the Japanese on December 7th, 1941, was an act of war which preceded the formal declaration of war by the Congress of the United States.

"In the case of *New York Life Insurance Company v. Bennion*, 158 F. 2d 260, 262, the Circuit Court of Appeals said: 'A valid distinction is drawn between an act of war and a state of war, and the attack of December 7th is characterized as an act of war, which did, but not necessarily, eventuate in a state of war. The Panay Incident on the Yangtze River in China is suggested as a comparable act of war which did not eventuate in a state of war.'

"In *Pang v. Sun Life Assurance Company of Canada*, 37 Hawaiian Reports, 208; 14 C. C. H. Life Cases, 496, in referring to the attack on Pearl Harbor by the Japanese, the Court said: 'True, the attack by the Japanese air and naval forces on the morning of December 7, 1941, constituted "an act of war", but an "act of war" and "a state of war" are two different things. An act of war may or may not lead to a state of war.'

"Justice MUSMANNO in his very excellent and scholarly opinion in the *Beley* case, supra, made a clear distinction between 'a state of war' and 'an act of war', when he said: 'There can be acts of war without there being a state of war. Beley was killed by an act of war but not in a state of war.'

"If it is true that Beley was killed by an act of war, then it would seem that Francis R. Thomas, Jr., the Insured in the instant case, also met his death by an act of war. Both met their death in Korea by enemy action.

"The plaintiff's counsel agrees that an act of war relates to an act of aggression or hostility committed

by one nation against another, such as the bombing of Pearl Harbor, or the sinking of the Lusitania, or perhaps, an act of serious sabotage by the agents of one government against another such as might induce a condition of war or a state of war. He argues, however, that the conflict in Korea cannot in any sense be an attack upon the sovereignty or territory of the United States because the military action which took place there was under the guise and authority of the United Nations members in which the various components sent armed units.

"The attack on the Lusitania was not an attack against the territory of the United States and yet it was considered an act of war.

"The attack on the Panay was not an attack on the territory of the United States and yet it was considered an act of war.

"The sinking of the Maine in the Havana Harbor was not an attack against the territory of the United States and yet it was regarded as an act of war.

"Furthermore, the attack on the United States forces in Korea, who were carrying out their committments to the Republic of Korea and the United Nations, was an attack on the sovereignty of the United States.

"The sovereign right of a nation includes the right to enter into agreements with other countries and to carry out those agreements. It was a sovereign act of this country when it entered into the United Nations and agreed to fulfill the pledges of that organization. It was a sovereign act when the United States agreed with Great Britain at the Cairo Conference, and later at Potsdam, to guarantee freedom and protection to the newly-formed Republic of Korea.

"The sovereign right of a nation includes the right to make alliances and to guarantee the freedom of

other nations if it is to the best interests of the citizens of the nation involved and its territories.

"When the North Koreans and the armies of the Peoples Republic of China by force of arms invaded the territory of the Republic of Korea, which we guaranteed should remain inviolate, they were making an attack on the sovereign power of the United States to lawfully enter into alliances and to carry out its committments to guarantee a peaceful world.

"The capture and search by Great Britain of American ships, and the imprisonment of its seamen, leading up to the War of 1812, was not an attack on the territory of the United States yet they were considered acts of war.

"See the *Prize Cases*—United States Supreme Court, supra.

"An act of war may be committed by one nation against the other without a state of war developing between the countries.

"In fact, a whole series of acts of war may be committed, and if the country, whose territory has been invaded, or whose military personnel or civilian population has been attacked, does not resist, a state of war may never develop, either declared or undeclared. This is particularly true when strong nations seek to subjugate weak nations.

"On December 1, 1943, President Roosevelt, General Chiang-Kai-Shek and Prime Minister Winston Churchill declared at the Cairo Conference that they were determined that Korea would become free and independent. This declaration was affirmed in the Potsdam Declaration of July 25, 1945. From that time on, the world knew that the United States and Great Britain and other countries were committed to a policy to guarantee the establishment of a free and independent government in Korea. Furthermore, as a member

of the United Nations, the United States was obligated to support the newly-formed Republic of Korea, just as Great Britain and France were obligated to come to the aid of Poland when attacked by the Germans in 1939.

"When North Korea attacked the Republic of Korea which had been formed under the sanction of the United Nations Commission, an act of war was committed against every nation who had guaranteed a free and independent Korea; and, if not then, an act of war was certainly committed against the United States and all other countries aiding in the defense of the Republic of Korea by the Peoples Republic of China, when they crossed the Yalu River one million strong and committed an unprovoked attack on the United Nations' forces.

"Under International Law, such an unprovoked attack would have justified every country whose troops had been attacked by the Red Chinese in declaring war upon the Peoples Republic of China.

"Many of the people in this country advocated such a policy and a battle of words still rages as to whether or not the United States Airmen under General MacArthur's command should have been permitted to bomb supply dumps in Manchuria, which were supplying the Red Chinese armies in Korea. From then on, every rifle and mortar that was fired, every grenade that was thrown, and every bomb that was dropped by Red China was an act of war.

"One hundred thirty-four thousand* American boys

---

* It would appear that the court inadvertently misstated this statistic. In the agreed statement of facts it was stated that on August 19, 1953, the Department of Defense reported that the United States *casualties* in the Korean conflict totalled 139,834 of whom 25,604 were killed in action, 103,492 were wounded in action, and 10,748 were missing or captured in action. It may be added that

were killed in the Korean conflict, and by far a large percentage of them came to their death by acts of war by the Red Chinese.

"The only case we can find involving similar language to the language used in the insurance policy in the instant case is the case of *Gagliormella v. Metropolitan Life Insurance Company*, 122 F. Supp. 246.

"In that case, the insured was killed in Korea on October 21, 1952, which was four days prior to the death of the Insured in the case at bar.

"In determining that the insured was killed by an act of war and that the beneficiary was not entitled to double indemnity under the accidental coverage, the court stated: 'It is even clearer that (to use the language of policy 17 989 790A) the insured's death occurred as a result of an act of war. Under this second policy it would not even be necessary to find that the United States was at war; it would be quite enough to find that either North Korea or South Korea was at war. See Stankus v. N. Y. Life Ins. Co. And those two powers were surely in a belligerent status.'

"Whether the Insured in the instant case came to his death while engaged in a conflict in which at least two of the belligerents were actually at war, or whether he came to his death while fighting as a soldier in the United States Army in an undeclared war, seems of no moment, because an act of war has never been specifically identified with either a declared or undeclared war.

"As we have seen, an act of war can be committed

---

it also appeared in the agreed statement of facts that from the beginning of the Korean conflict on June 25, 1950 to the date of the armistice on July 27, 1953 more than 1,000,000 members of the armed forces of the United States were engaged in Korea, and the cost of the conflict to the United States was about $22,000,000,000.

without the act ever culminating in a war either declared or undeclared.

"A whole continuing series of acts of war may be committed by belligerents without either belligerent formally or informally recognizing the existence of a state of war.

"Even the warlike act of an individual soldier under orders of a commanding officer and sanctioned by a recognized government may be classified as an act of war.

"If we were to consider an act of war to be a warlike act committed in carrying on a formally declared war, as advocated by the plaintiff, we would be casting aside the generally accepted definition of an act of war in favor of an entirely new concept of the term.

"If the term 'act of war' is ambiguous and can have two meanings, just as the word 'war' has, then it would be incumbent on us to construe it most strongly against the insurance company, who drew the contract of insurance, and hold an act of war only has reference to formally declared war.

"Prior court decisions buttressed by historical fact are all exceedingly clear, however, as to the meaning of the term 'acts of war', which we have seen has never been specifically associated with a formally declared war.

"According to the agreed statement of facts at the time of the Insured's death, he was a member of Company 'C', First Battalion, 7th Marines, First Marine Division, engaged in combat with the military forces of North Korea and the Chinese Peoples Army.

"From the citation accompanying the awarding of the Navy Cross posthumously given the Insured, his heroism in the particular engagement with the enemy must have been one of the most courageous exploits of the war.

"His deeds will be forever enshrined with the records of the noblest and most courageous of the United States Marines.

"Can anyone seriously argue that the Insured did not come to his death by an act of war while fighting for his country?

"His own government recognized the fact that he was killed by an act of war in awarding him the Navy Cross.

"This citation is only awarded to a person 'who distinguished himself by extraordinary heroism in connection with military operations against an armed enemy.' (56 Statute 743 U. S. C. A. Section 356).

"We are, therefore, of the opinion that the Insured came to his death through an act of war.".

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I find myself somewhat trammeled in preparing my dissent in this case because the Majority of the Court did not write an opinion of its own, but accepted almost wholly the opinion of Judge LORAN LEWIS of the Court of Common Pleas of Allegheny County. Judge LEWIS is a jurist of distinguished qualifications and, if I may allow myself a personal reference, he is a close and respected friend. I agree with my colleagues here that Judge LEWIS wrote an able opinion. I will go further and say that he wrote a brilliant opinion. The only difficulty about it, as I see it, is that he deviated from a decision rendered by this Court quite recently on the very same subject.*

---

* It is an interesting, if not disturbing, phenomenon, that this is the third time in as many months that a Court of Common Pleas has reversed the Supreme Court of Pennsylvania without arousing

In writing this Dissenting Opinion, however, I shall address myself to my colleagues and not to Judge LEWIS. The members of the Court below did their duty as they saw it. The writer of their opinion was exhausting in his research, profound in his analysis, and his expression has imprinted in the records of this Court a product of high literary merit. If the Court below erred in interpreting existing law it devolved upon this Court to discern the deviation and make the necessary adjustment.

Standing on the high plateau of review, isolated from the smoke of battle of nisi prius, and unencumbered by contending parties importuning for rapid decisions, it could be assumed that this Court would, with the employment of meditation and the application of reflection, repair the rent in the fabric of *stare decisis* and once again make whole the pattern of justice under law. But this Court failed to assume that burden. It made no attempt to explain why in February, 1953, it resolved an issue, which we will shortly consider, one way, and, today, decided the same, identical issue in a wholly different way. In February, 1953, this Court expounded in convincing language that under *certain circumstances* the word "war" does not mean war. Today it declares that in exactly the *same circumstances*, it does mean war. In February, 1953, it announced that the Korean conflict was not a war. Today it announces that it was a war. Non-lawyers who might try to reconcile our decision of 1953 with the decision of this moment would not corrugate their brows one-half as much as lawyers and judges who will devote themselves to the same Herculean effort of

any expression of concern on the part of this Court. The other cases are *Commonwealth v. Green*, 387 Pa. 515, and *Clewell v. Pummer*, 388 Pa. 592.

attempted reconciliation. Let us now proceed to the objective facts in the litigation at hand.

On March 30, 1948, Francis R. Thomas, Jr., purchased from the defendant Metropolitan Life Insurance Company an insurance policy which provided for the payment of double indemnity benefits in the event his death resulted from "bodily injuries caused solely by external, violent, and accidental means, and that such death shall not have occurred . . . (f) as a result of an act of war."

The insured was killed in action on October 27, 1952, and his father, the beneficiary, applied for double indemnity benefits which were refused by the insurance company on the averred basis that Francis Thomas, Jr., came to death "as a result of an act of war." The beneficiary filed suit for $5,000, the amount involved. The lower Court entered judgment for the defendant insurance company and this appeal followed. There is only one question before us, and that is: Did Francis Thomas, Jr., die as the result of an act of war?

It would be difficult to conceive of a more realistic and genuine war scene than the one in which Francis Thomas met his death. As a United States Marine engaged in action against enemy forces in Korea, while his company was under heavy mortar and artillery fire, he advanced on the foe with rifle and grenade and was struck down by an exploding enemy grenade. There is no doubt that Francis Thomas was killed in battle. Was that battle-death the kind of death which was excluded from the insurance policy of which the plaintiff in this case is the beneficiary? The answer to that question is not to be found alone amid the smoke and acrid smell of gunpowder on the bleak, cold Korean hill which witnessed the heroic and glorious death of Francis Thomas. It is to be found also in the carpeted, comfortable, and commodious offices of the Metropoli-

tan Life Insurance Company where its skilled, expert, and experienced lawyers drafted the contract which was to become the insurance policy purchased by 17-year-old Francis Thomas. What did these lawyers have in mind when they said that their company would not pay double indemnity in the event the insured came to his death as the result of an act of war? What language did they employ in expressing the contingency under which the company would not be required to pay the additional sum stipulated in the policy? They knew that under Article I, Section 8, Clause 11, of the United States Constitution, only Congress can declare war and that, therefore, a state of war can come into being only when the elected representatives of the people of the United States by suitable legislation so pronounce. Thus, in preparing the formal instrument which was to bind their master, the lawyers would naturally adopt formal language and we can only conclude that when they used the word "war" they could only mean war in its constitutional sense.

Was the Korean conflict, then, war in its constitutional sense?

The answer is No.

On February 20, 1951, the Committee on Foreign Affairs of the United States House of Representatives declared: "No declaration of war has been made by the Congress. The President has not proclaimed a state of war, nor have the North Korean or Chinese Communist authorities."

While very interesting, it is rather a profligate expenditure of words to discuss what is meant by war. We all know that there can be the taking of life, destruction of property, and draining of resources in rebellions, expeditions, insurrections and raids which suggest war and which certainly feature warlike activities, but when we speak constitutionally, *and a*

*Court has no right to speak otherwise,* war can only mean a war *declared to be such by Congress.* And we know that Congress did not declare war on the foe in Korea. No matter how strange it might seem that the United States could have waged so serious a contest of arms as that which ensanguined the entire Korean Peninsula, and yet the contest not become a state of war, the fact still remains that Congress did not declare war—and only Congress can declare war. The Metropolitan Life Insurance Company's legal staff knew that when they expressed a certain contingency through the medium of the word "war," only a certain legal status could result from the use of that word, and the Metropolitan Life Insurance Company must be held accountable for the employment of that word in its formal and documentary sense. If the Metropolitan legal staff had wanted to exclude conflicts which were not constitutionally declared wars, they could have done this clearly, neatly, and easily. All they had to do was to add after the word, "war," the words "declared or undeclared." But they did not do this and we have no authority to excuse that omission by speculation or rationalization, or, least of all, on some arbitrary theory which saves the company from a voluntarily assumed contractual obligation.

What is war and what is not war has been decided by the Courts of the nation so often that no lawyer, or insurance policy drafter, can plead ignorance on the subject. Let us consider the case of *West v. Palmetto State Life Ins. Co.,* 202 S.C. 422.* There, the insured,

---

* The principle enunciated in this decision was adopted in many other cases, e. g., *Roseman v. Idaho Mutual Benefit Association,* 65 Idaho 408; *Savage v. Sun Life Assurance Company of Canada,* 57 F. Supp. 620; *Pang v. Sun Life Assurance Company of Canada,* 14 CCH Life Cases 496, 37 Hawaiian Rep. 208.

a ship captain, was killed at Pearl Harbor on December 7, 1941. His insurance policy carried the provision that double indemnity for accidental death would not be payable in the event death should occur while the insured was "engaged in military or naval service in time of war." The insurance company refused payment, urging that the Pearl Harbor engagement certainly was war. The Supreme Court of South Carolina rejected the contention, declaring that the Japanese aerial assault on December 7, 1941, "did not constitute war in the legal sense or within the meaning thereof intended in the policies." After quoting various authorities, the Court said: "It is seen from the foregoing authorities that the declaration by Congress of war on Japan on December 8 *was the only legal way in which this country could be placed in a state of war with that aggressor nation.* The Constitution so provides, Art. 1, §8, supra. That the policy contracts were entered into by the parties in contemplation of that clear law, and subject to it, cannot be denied; and they are bound by it."*

Everyone knows that Pearl Harbor represented one of the most fearful battle disasters of all time. We lost battleships, cruisers, destroyers, dry docks, plane tenders, planes and suffered in killed some 2500 officers and men as well as hundreds of wounded. Nonetheless, in the eyes of the Constitution, the Pearl Harbor debacle was not war.

This is not fine-spun reasoning. It is jurisprudence which makes for order and regularity in an intelligent commonwealth of intelligent people. The Constitution has spelled out what is war, and it devolves upon lawyers, judges, and businessmen to adjust their affairs and their language accordingly. There is no hardship

---

* Italics throughout, ours.

involved in this, since, as indicated, insurance companies may exclude payment for deaths arising from undeclared wars by simply adding the words "undeclared war." Is that asking too much?

What is war? The Majority makes of it a very complicated, elusive thing. Corpus Juris defines it quite simply. It is "an armed struggle carried on between two political bodies each of which exercises de facto authority over persons within a determinate territory, and its existence is determined by the *authorized political department* of the government. So, lawful war can never exist *without the actual concurrence of the war-making power,* but may exist prior to any contest of the armed forces. The *courts are bound by a declaration or determination by the proper department of government that a war exists,* while until there has been such a declaration or determination the courts cannot take judicial notice of the existence of a war by their government." (67 C.J. 336)

It is of no help to us in considering the problem before us to look at English cases, because England does not have a written constitution as we have. Nor is it particularly helpful to cite cases which arose during our Civil War because that period was a most abnormal one, with the government itself being challenged and threatened with destruction.

In view of what has been said, therefore, it must be obvious that the use of armed forces in itself does not, under American law, constitute war. From 1798 to the present time the United States has sent armed forces abroad over 150 times. Many of these enterprises involved nearly every aspect of war but they were never recognized officially, judicially, or historically as war. In the expedition against the Barbary States in 1801-05 and 1815, in the expedition against Mexico in 1914-17, in the Boxer Expedition in China,

526

and the many Nicaraguan Marine expeditions, there were movements of troops, firing of artillery and small arms, skirmishes, battles, captures, loss of life and infliction of wounds, but constitutionally, documentarily, and governmentally, none of these martial ventures has been recorded as War. A state of war brings into being rights and liabilities of such a serious and solemn character that the framers of the Republic wrote into the Constitution the wise provision that only Congress can declare a state of war.

In attempted support of its position that there can be a state of war without a declaration by Congress to that effect, the Majority cites the case of *Hamilton v. McClaughry*, 136 F. 445, stating that the Court in that case "held that the Boxer Rebellion in 1900 was a war." The decision in that case made no determination on the status of the Boxer Rebellion as war in the constitutional or de facto sense. The case had to do with court-martial proceedings involving the military trial of an American soldier who killed another American soldier in China at the time of the stationing of American troops in that country to protect the American legation. The District Court of the United States simply held that at the time of the murder, "there prevailed in China *a condition of war, within the spirit and intent of the fifty-eighth article of war,*" thus giving jurisdiction to the military tribunal.

It is not for the courts to appraise a military situation and from it decide whether a state of war exists or does not exist. We do not have the facilities and certainly not the authority to count the divisions employed, ascertain the calibre of the guns in action, estimate the tanks in movement, calculate the intensity of the air power in the skies, and, from it all, decide in any given situation, if the United States is at war. We have only one measuring rod to use in determin-

ing whether a martial situation has reached the point of war, and that is when Congress declares that it has reached that point. For reasons which are not for us to question or even to consider, Congress, in the exercise of its constitutional prerogatives, decided not to bring the Korean conflict within the boundaries of War. Are we now a super-Congress to say that, despite the fact that Article I, Section 8, Clause 11, of the Constitution was never employed in determination of the Korean conflict, we, the Supreme Court of Pennsylvania, will nevertheless legislate that contest at arms into constitutional war? If so, where do we derive such authority?

Once this Court begins to decide what is war and what is not war, disregarding the clear and mandating language of the United States Constitution, chaos has thrust its head under the tent of governmental order and responsibility. In point of ineradicable fact and historical unbudgeability we decided only four years ago that we do not have the power. If it has sprouted in the quadrennium, who sowed the seed and where?

On February 14, 1953, in the case of *Beley v. Pennsylvania Mutual Life Insurance Co.*, 373 Pa. 231,* we solemnly and unequivocally declared that the Korean conflict was not war. Chief Justice HORACE STERN, speaking for the Court, said with noonday clarity: "The existence or non-existence of a state of war is a political, not a judicial question, and it is only if and when a formal declaration of war has been made by the political department of the government that judicial cognizants may be taken thereof."

We, therefore, decided in the *Beley* case, in 1953, that the Korean expedition was not war. Why do we

---

* The United States Supreme Court denied certiorari: 346 U. S. 820 (1953).

now, in 1957, say it was war? The revered United States Supreme Court Justice JACKSON, commenting on the fact that the parties in a certain case* had changed positions after the legal action had been begun, made the unique observation: "In this Court the parties changed positions as nimbly as if dancing a quadrille." Paraphrasing Justice JACKSON, I would say that this Court has demonstrated the same terpsichorean agility in taking up today a position diametrically opposed to the one it held four years ago. How are lawyers to advise their clients on their rights under insurance policies when the highest court in the Commonwealth, on that subject, emulates the inconsistency of the weathervane and the irresoluteness of Cynthia?

In the 1953 case, the insured, Andrew Beley, was also 17 years of age when he took out his policy. He also became a soldier, he also sailed for distant Korea, and he also met a valorous death on the battlefields of Korea. His policy also excluded payments to his beneficiary in the event he was killed in military service in time of war. We heard extended argument on the *Beley* case, the lawyers filed illuminating briefs, and eventually this Court, after extensive study and full deliberation, concluded that Beley's mother was entitled to the benefits stipulated in the policy because her son was not killed in that kind of war intended in the policy, namely, a constitutionally declared war. Why, now, four years later, do we deny similar benefits under a similar insurance policy taken out by Francis Thomas, Jr. If the Korean conflict was not war when Andrew Beley was killed on March 7, 1951, why was it war on October 27, 1952, when Francis Thomas was killed? The locale was the same in both

---

* *Orloff v. Willoughby*, 345 U. S. 83.

cases—Korea; the antagonists were the same, the United Nations versus North Korea and its Chinese allies; the object of the United States was the same, the execution of a decision of the United Nations of which it formed an integral part. Where is the difference between the two cases? Blood was pouring in 1951 as it was in 1952 over the desolate Korean landscape. Why was it *not* war for Beley but *war* for Thomas?

The Majority attempts to rationalize the Korean conflict into a war by arguing that the attack by the Communists on the United Nation forces constituted an attack on the sovereignty of the United States. Specifically it says: "When the North Koreans and the armies of the Peoples Republic of China by force of arms invaded the territory of the Republic of Korea, which we guaranteed should remain inviolate, they were making an attack on the sovereign power of the United States to lawfully enter into alliances and to carry out its commitments to guarantee a peaceful world."

In the early part of 1941 German submarines attacked the American ship *Robin Moor*. On September 11, 1941, they sank the *Sessa,* also flying the American flag. In the same month the *Pink Star* was attacked off Iceland. In October the tanker *I. C. White* and the freighter *Lehigh* were torpedoed in the North Atlantic, all outside the war zone proclaimed by the Germans themselves. In October, 1941, the Germans heavily damaged the United States destroyer *Kearney,* and on October 30, 1941, they torpedoed the U.S.S. *Reuben Jones,* which sank with considerable loss of life. All these torpedoings were attacks on the flag of the United States, they were assaults on the sovereignty of the United States, but they did not constitute war. They were *acts of war,* but they did not of themselves establish a state of war, because only Congress could do that.

But if, arguendo, the Communist offensive in Korea transformed the Korean expedition into war when Francis Thomas was killed, why did it not accomplish the same legal metamorphosis when Andrew Beley was killed? Did the United States enjoy less sovereignty when Beley stopped an enemy's bullet than when Thomas received a grenade in his vitals?

But argue as much as the Majority may, about the Communist attack on United States sovereignty converting the United Nations action in Korea into an American war, no amount of argumentation, no line of reasoning, no type of logic can cut away the mountain range in its path that this very Court planted on February 14, 1953, when it proclaimed, in whatever tones of thunder a sovereign Court can proclaim, that: "It is clear that the action being waged in Korea is *not* a 'war' within what may be termed the 'constitutional' or 'legal' sense of that term."

If the Majority here had said that it was overruling the *Beley* decision, then at least it would be consistent with what it is doing in the present case; and, in any event, the legal profession would know in what direction the weathervane was pointing. But this Court does not overrule the *Beley* decision. It stands by it, and attempts to distinguish it from the case at bar. But in doing so, it undertakes the hopeless task of differentiating between Roland and Oliver. Thus, it points out that in the Beley insurance policy the exclusionary phrase read: "Time of war," whereas in the Thomas policy the exclusionary phrase reads: "act of war." Is that a difference? The Majority says that Beley was not killed in time of war (Korean), but that Thomas was killed by an act of war (still Korean). Would Aristotle approve of that kind of logical differentiation?

It is to be noted that in his whole admirable exposition of the issue involved in the *Beley* case, Chief Justice STERN did not once mention the phrase "time of war," except to quote it from the insurance policy. He did not analyze or define the word "time" as it appears in the phrase "time of war." He considered and discussed only the word "war," which, obviously, is the catalytic agent in the whole alembic of discussion. In the very first sentence of his opinion, Chief Justice STERN asked: "Is the present struggle in Korea a 'war' within the meaning of that term as employed in a certain life insurance policy?" Speaking for the Court he answered that question No. Why does the Court today answer the same question Yes?

In affirming the lower Court's decision denying payment of insurance benefits to the plaintiff, this Court argues that Francis Thomas's death was an "act of war" and thus falls within the interdicting provision in the policy which uses the same phrase. We have seen that so far as the courts are concerned, the word "war" means constitutional war; it means congressionally declared war. It cannot mean anything else. We said so on February 14, 1953. The Constitution of the United States says so. Do we need any higher authority? Thus, the phrase "act of war" must be read "act of constitutional war." Since the Korean conflict is not a constitutionally declared war, that fact should of itself demonstrate that the exclusionary provision in the policy is inoperative. However, since the Majority discusses at length the phrase "act of war," candor requires comment on the Majority's use of those words.

We know what "war" is. What is "act"? Standing alone, the word "act" is practically rudderless unless, of course, we are referring to a law passed by a legislative body or the division of a stage play. But

the word "act," when it forms part of a phrase, can be one of a thousand things. It can be an act of kindness, an act of mercy, an act of anger, an act of charity, an act of reprisal, an act of bankruptcy, an act of sale, the act of a human being, the act of a chimpanzee, the act of an elephant, the act of a mosquito, but in each instance where the act is the product of something else, it is the something else which dominates the phrase. In "act of war" it is "war" which controls and gives substance to the entire phrase. The base of the prepositional phrase, "war" is what imparts significance and precision to the antecedent noun, "act."

As the base of the prepositional phrase under discussion, "war" thus becomes the foundation, the bedrock of the pyramid of meaning; it is the granitic bottom which upholds the entire superstructure. Therefore, it is apparent that the cardinal error in the Majority's Opinion is that it hinges the explanation of its decision on the word "act," when the emphasis, of course, should be on the word, "war." The Majority pitches its tent of reasoning on the apex of the pyramid, instead of on the firm ground which supports the pyramid. Naturally, resting on so precarious a scaffolding, the whole rationalization of the Majority must fall when touched by the lance of logic or jostled by the probing rule of grammatical analysis.

But the Majority will say that it is not dividing "act" from "war," and that it uses the entire phrase "act of war" as one indivisible concept. But what concept does the Majority have in mind? In narrating how Francis Thomas was killed, the Majority describes act of war in the sense of an incident of warfare. And there is a meaning as wide as the ocean between war and warfare. Every arrow shot by Indians against frontiersmen was an act of warfare but it was not War; every cannon ball fired across the bow

of a merchantman by pirates was an act of warfare but not War; every shooting up of a border town by bandits crossing the Rio Grande was an act of warfare but it was not War. When the United States Army drove the so-called "Bonus Army" from Washington in the very shadow of the Capitol dome, the Army used rifles, bayonets, flame throwers, and the full equipage of war, but no one referred to this act of warfare as War. In the Whiskey Rebellion and Shay's Rebellion there were acts of warfare, but no writer of American history has ever called either of those uprisings War.

The phrase "act of war" in itself has many meanings. It may mean a *casus belli,* it may mean an incident of warfare, it may mean a formal situation which of itself presupposes a state of war, it may mean a provocation of war, it may mean a maneuver short of war, it may mean an uncompleted effort at war. An act of war may precede a declaration of war, and yet not be part of war, it may follow a termination of war and still not be part of war, it may be committed by an irresponsible agent of government and, upon suitable disavowal by the heads of government, is no longer considered as an act of war.

The meaning to be assigned to "act of war" in any given connection naturally depends on the context in which it is used. Beley was killed by an act of war in that he was killed through an incident of warfare. Thomas was also killed by an incident of warfare. And if we allowed payment of insurance benefits, which we did, when Beley was killed by an incident of warfare, which is certainly within the generic scope of "time of war" (mentioned in the Beley policy), why do we withhold payment in the Thomas killing?

In denying payment on the Thomas policy, the Majority uses the phrase "act of war" synonymously with "warlike act." However, the insurance company policy-

drafters did not so use "act of war." If the insurance company intended "act of war" to mean "warlike act", it would exclude payments even if a soldier were accidentally killed during peacetime maneuvers because such a death would certainly have resulted from a warlike act. But not even the insurance company would argue that it could legally deny payments in such a situation. But if it still be insisted that the insurance company intended "act of war" to be synonymous with "warlike act," then it must be admitted that the phrase "act of war" is at least capable of both interpretations: (1) a warlike act, and, (2) an event performed in a state of war. That being so, and it is irrefutable that it is so, then, under the rules of contract construction, which will be discussed later, the contract must be interpreted in favor of the insured.

I have said that "act of war" has many meanings, and unless the phrase is used precisely and in a setting which identifies the significance intended by the phrase, inextricable confusion will result. For instance, in its discussion, the Majority uses the phrase "act of war" in many varied ways but it attempts to synonymize them all into one identical meaning. Thus, it speaks of the sinking of the Lusitania as an act of war; it speaks of Pershing's expedition into Mexico as an act of war; it speaks of Thomas's death as an act of war. These three episodes differ as much from one another as if they happened on three individual planets. The sinking of the Lusitania was a *casus belli;* the Pershing Punitive Expedition was a reprisal which did not eventuate in war; the killing of Thomas was an incident of warfare. The Majority speaks of the bombing of the Panay, the explosion of the U.S.S. Maine, the Boxer Rebellion in China, the air attack on Rotterdam, and the destruction of Warsaw, all as acts of war. But certainly those acts of war cannot be equated with

the act of war made up of the isolated incident of one soldier's hurling a grenade against another soldier on the battlefield of an undeclared war. In the Pershing Punitive Mexican Expedition, and the Panay, Maine, Lusitania, Rotterdam, and Warsaw events, the actions of sovereign nations were involved. Those acts of war can have no possible relationship to hand-to-hand combat between two soldiers.

The Majority Opinion states: "Justice MUSMANNO in his [concurring] opinion in the Beley case, supra, made a clear distinction between a 'state of war' and 'an act of war', when he said: 'There can be acts of war without there being a state of war. Beley was killed by an act of war but not in a state of war.' "

When the writer of this Opinion made the above quoted statement he was not distinguishing between an "act of war" and a "state of war." He was showing that an act of war may occur *during* a state of war as well as *outside* a state of war. Thus, as I have already shown, the sinking of the United States destroyer *Reuben Jones* was an act of war, but it did not occur *during* a state of war. The bombing of Pearl Harbor was an act of war but it did not occur during a state of war. The fact that I stated that Beley was killed by an act of war establishes that I regarded this particular act of war (and the phrase was here used in the sense of an incident of warfare) was *not* excluded by the insurance policy. I maintained that the act of war which killed Beley did not deprive his mother of benefits under the insurance policy, as I maintain today that the act of war which killed Thomas does not deprive his father of benefits under the insurance policy. I agreed with the Majority in the *Beley* case because it said that the Korean conflict was not a war and it authorized payment of insurance payments, and I disagree with the Majority in the case of today because, con-

trary to what it said four years ago, it now holds that the Korean conflict was a war.

The Majority says further in its opinion: "If it is true that Beley was killed by an act of war, then it would seem that Francis R. Thomas, Jr., the insured in the instant case, also met his death by an act of war. Both met their death in Korea by enemy action."

I agree with this statement completely, and the inevitable question follows: If this Court found that Beley was killed by an *act of war* and it *affirmed* the payment of insurance benefits, why does it now, finding that Thomas was also killed by the same kind of an *act of war*, *deny* the payment of insurance benefits? How does the death of Thomas differ from the death of Beley? As the Majority well says: "Both met their death in Korea by enemy action." But how does the Majority explain the fact that in 1953 when it found that Beley was killed by enemy action, it authorized payment of insurance benefits, but today that it finds Thomas was killed by the same enemy action, it refuses payment of insurance? Where is the consistency? Where is the logic? Where is the law? Where is the justice? The lawyer for the plaintiff in this case has my earnest sympathies because I can understand to what straits he will be put in trying to explain to his client (who, of course, must know about the *Beley* case), why the Beley family was entitled to insurance benefits but the Thomas family is not entitled to insurance benefits, when the Supreme Court of Pennsylvania specifically says and admits that both boys "met their death in Korea by [the same] enemy action."

To allow the defendant insurance company in the case at bar to escape liability is to put a premium on contractual looseness. In the *Beley* case, Chief Justice STERN said: "A policy of life insurance is a highly technical instrument, drawn up presumably with me-

ticulous care by legal experts on behalf of the Insurance Company, and who not only intend to use all terms in their legal sense but know how to accomplish that result; it may be assumed, therefore, that if defendant had here meant to invest the term 'war' with a broader connotation than its 'constitutional' or 'legal' intendment, it would have effected this by the addition of words indicating such an intention, as, for example, 'declared or undeclared' war." We thus ruled that if an insurance company prefers to use language which makes it liable under certain conditions, when it could by a slight modification exonerate itself from such liability, it uses such language at its peril. Why does that rule not apply in the present Thomas case?

If the Majority does not accept my view that the Thomas insurance policy does not exclude the payment of certain benefits when the insured is killed in an undeclared war, it certainly must agree, by the very length of its opinion, that there is some ambiguity in the policy as to what it actually means. Under those circumstances should not the policy be interpreted most favorably to the insured?

Of all contracts, the insurance policy should be the most clearly worded. When a person purchases a policy with benefits payable to those he loves, he wants to give to those endeared ones not a sword with which to fight a bitter and costly legal battle, but a vehicle in which they may ride over the lonely and rocky road he leaves behind him. It is for that reason that we have frequently said that "Where the terms of a policy are susceptible of different interpretations the construction most favorable to the insured should be the one adopted . . . The reason for this is that the language of the policy is prepared by the insurer, presumably with the purpose in mind of protecting itself against future claims in regard to which it does not desire to

accept liability." (*Snader v. London & Lancashire Indem. Co.*, 360 Pa. 548, 551.)

This fundamental principle of construction was reinforced by our statement in the *Beley* case that: "Obviously the right of an insured to recover under a life insurance policy should not be left to depend upon the determination of a question not governable by any definite test either legal or factual; on the contrary, its terms and conditions should be interpreted according to some definite and uniform standard." *That* definite and uniform standard we have established, namely, that war means war according to the Constitution. Why are we departing from that standard which is so simple, so just, and so fair? Why should the right of a beneficiary under an insurance policy have to depend upon commas, semi-colons and exhausting reasoning that might be applicable to an algebraic problem but hardly consonant with the simple duty of doing justice under a contract whose intent and purpose are clear?

I dissent from the decision of the Majority for the following reasons:

1. It deprives the plaintiff Francis Thomas, Sr., of a recovery to which he is entitled.

2. It accomplishes a retreat from a principle solemnly arrived at and solemnly announced.

3. It accomplishes the reversal of a previous decision without a specific statement to that effect.

4. It is a blow to the integrity of precedents.

5. It plays at ducks and drakes with the principle of stare decisis.

6. It throws a veil of perplexity, doubt and confusion over insurance contracts.

7. It gives to "war" a hydra-headed meaning.

8. It encourages the use by insurance-policy-drafters of ambiguous phrases.

9. It ignores a provision of the United States Constitution.

10. It presumes that the charter of the United Nations supersedes the authority of the United States Constitution.