AETNA LIFE AND CASUALTY COMPANY (CASUALTY & SURETY DIVISION), Plaintiff,

v.

Donald Lee McCABE and Gale Greenberg, Defendants.

Civ. A. No. 78–598.

United States District Court,
E.D. Pennsylvania.

Jan. 31, 1983.

Francis E. Shields, Pepper, Hamilton &
Scheetz, Philadelphia, Pa., for plaintiff.

James E. Beasley, Beasley, Hewson, Casey, Colleran & Stopford, Philadelphia, Pa., for Gale Greenberg.

Louis Samuel Fine, Fine, Staud & Grossman, Philadelphia, Pa., for Donald McCabe.

## MEMORANDUM AND ORDER

SHAPIRO, District Judge.

This is an action for declaratory judgment by the plaintiff insurance company, Aetna Life and Casualty Company ("Aetna") against Dr. Donald Lee McCabe ("McCabe"), its insured under a medical malpractice policy, and Gale Greenberg ("Greenberg"), a former patient of McCabe's who obtained a judgment in her favor against McCabe in a medical malpractice action. Aetna seeks a declaration of non-coverage under Dr. McCabe's Professional Liability Policy. Before us for decision are motions for summary judgment filed on behalf of defendants McCabe and Greenberg. Defendants argue that Aetna is collaterally estopped by the jury's verdict upon special interrogatories in Greenberg's medical malpractice action against McCabe, *Greenberg v. McCabe,* C.A. No. 76–342, in which Aetna defended McCabe, and that Aetna cannot relitigate facts determinative of coverage that were decided therein. The defendants also contend that Aetna has waived its right to raise certain of the defenses it now seeks to invoke and that its reservation of rights while defending Dr. McCabe was ineffective. Aetna contends the doctrines of waiver and estoppel are inapplicable and the reservation of rights was valid. Defendants claim Aetna as insurer must pay the total amount of the jury award, including that for punitive damages, but plaintiff asserts it cannot legally insure against punitive damages and that its coverage in any event was limited to $250,000 for any one claim. For the reasons which follow, defendants' motion for summary judgment will be granted in part and denied in part.

## I. *Facts*

The parties have stipulated to many of the important facts. (Stipulation of Facts, Dkt. No. 62).

Aetna issued a "Professional Liability Policy," No. 57 DZ 28720, to McCabe for the period commencing January 2, 1974 through January 2, 1975. (Stipulation # 5). An identical policy was in effect between Aetna and McCabe for each prior year since 1968. (Stipulation # 6). From 1968 to 1974 inclusive, McCabe was a practicing Doctor of Osteopathic Medicine in Harrisburg, Pennsylvania. (Stipulation # 7).

The Coverage Agreements of McCabe's policy with Aetna provided:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

Individual Professional Liability Coverage: injury arising out of the rendering of or failure to render, during the policy period, professional services by the individual insured, or by any person for whose acts or omissions such insured is legally responsible, except as a member of a partnership, performed in the practice of the individual insured's profession described in the declarations including service by the individual insured as a member of a formal accreditation or similar professional board or committee of a hospital or professional society.

The policy contained only one exclusion, which provided:

This insurance does not apply to liability of the insured as a proprietor, superintendent or executive officer of any hospital, sanitarium, clinic with bed and board facilities, laboratory or business enterprise.

The "limits of liability" section of McCabe's policy provided:

The limit of liability stated in the declarations as applicable to "each claim" is the limit of the company's liability for all damages because of each claim or suit covered hereby. The limit of liability stated in the declarations as "aggregate" is, subject to the above provisions respecting "each claim", the total limit of the company's liability under this coverage

for all damages. Such limits of liability shall apply separately to each insured.

On January 15, 1976, Greenberg filed a complaint against McCabe in the United States District Court for the Eastern District of Pennsylvania, C.A. No. 76–342, which alleged that McCabe's negligent care and treatment had caused her injury. McCabe notified Aetna of the complaint on March 23, 1976 and Aetna retained the law firm of Kaliner and Joseph to represent McCabe on March 31, 1976. (Stipulation # 8, # 9).

On March 31, 1976, C.F. Higgins, Jr., Supervisor, Philadelphia Claim Department of Aetna, also sent a letter to McCabe regarding coverage under the policy. (Exhibit G–9 to Fact Stipulation). This letter stated in relevant part:

We have received Complaint filed against you in the above case. This matter has been referred to our attorney(s) Kaliner & Joseph, Suite 1600 Two Penn Center Plaza, Phila., Pa., 19102. Our attorneys will take all steps required on your behalf in accordance with the terms and conditions of the policy of insurance applicable to this case.

The amount sued for is "In excess of Ten Thousand Dollars" for injuries allegedly sustained by the above claimant. We must call to your attention the fact that it is possible for a judgment to be obtained in excess of your policy limits. We must also call to your attention the fact that there is demand made for punitive damages. According to present Pennsylvania law it is against public policy for an Insurance Carrier to pay that portion of a judgment allocable to punitive damages against a Tort Feasor. For these reasons you are at liberty, if you so desire, to associate your own personal counsel, at your own expense, in the defense of this suit.

On April 23, 1976, Edward Joseph of Kaliner & Joseph entered an appearance on behalf of McCabe and continued to represent McCabe through the entire proceedings. (Stipulation # 13). Aetna conducted the investigation of the *Greenberg v. McCabe* case.

*Greenberg v. McCabe* was originally scheduled for trial before the Honorable Joseph S. Lord, III, on or about March 14, 1977. (Stipulation # 28). Aetna first claimed a "reservation of rights" to disclaim coverage by letter to McCabe dated March 11, 1977. (Stipulation # 26; Exhibit G–30 to Stipulation of Facts). This letter stated:

Dear Dr. McCabe:

This is to advise you that we reserve our rights to disclaim coverage for you in the above case. Under the terms of our policy, coverage is afforded for:

"all sums which the insured shall become legally obligated to pay as damages because of: injury arising out of the rendering of or failure to render, during the policy period, professional services by the individual insured..."

Review of your deposition in this case indicates that you have testified very specifically that your sexual activity with Mrs. Greenberg was not part of your therapy. The injuries claimed in the complaint, some or all of which are claimed to be permanent, are as follows:

Left frontal skull fracture;
Cerebral concussion;
Headaches;
Blurred vision;
Intravaginal trauma;
Parametritis;
Multiple contusions;
Abrasions and bites;
Scarring;
Shock;
Mental anxiety;
Embarrassment;
Injury to her nerves and nervous system;
Pain and mental suffering;
Lost earnings and earning capacity; and
Special damages.

All such injuries are related to an incident which occurred in the early morning hours of February 11. Whatever happened between 2:30 a.m. on that date and the injuries that Mrs. Greenberg suffered were not the result of professional treat-

ment, and therefore, not insured under your medical malpractice insurance policy with this company. You are therefore advised at this time that this company will pay no judgment nor indemnify you for any judgment that you may pay arising out of the matters complained of in the complaint filed in this case.

We will continue to afford you a defense throughout this case, but this cannot be construed in any way to be a waiver of our position that you are not entitled to coverage on the facts involved in this case.

Aetna wrote a supplemental letter to McCabe regarding coverage on March 16, 1977. (Stipulation # 27, Exhibit G–31 to Stipulation of Facts). That letter stated:

Dear Dr. McCabe:

This letter will supplement our correspondence of March 11, 1977. This is to advise you that we reserve our rights to disclaim coverage for any damages, in the above captioned case, incurred at any time that did not arise out of professional services rendered by you or professional services that you failed to render.

As previously indicated, we will continue to afford you a defense throughout this case, but this cannot be construed in any way to be a waiver of our position that you are not entitled to coverage in the facts envolved [sic] in this case.

*Greenberg v. McCabe* was tried before the Honorable Joseph S. Lord, III and a jury from September 6, 1977 to September 16, 1977. (Stipulation # 29). Joseph was sole counsel representing Dr. McCabe (Stipulation # 30); Chief Judge Lord did not permit the personal attorney retained and paid for by Dr. McCabe to participate in the trial. (No. 76–342, N–T 1–17, dkt. # 67).

Greenberg testified at that trial that she had come as a patient to McCabe in 1968, for treatment of asthma and anxiety, on the recommendation of a friend. During therapy sessions McCabe administered certain drugs that were either illicit or "contraindicated." She testified that she and McCabe began to have sexual relations after she had been his patient for approximately six months and that their affair

continued through February, 1974; Greenberg lived with McCabe beginning in the fall of 1972. There was also testimony that McCabe continued to prescribe drugs for Greenberg until an altercation on February 11, 1974.

Expert testimony was presented with regard to McCabe's drug therapy and the phenomenon of transference in psychiatric treatment. Transference was described as a phenomenon in psychiatric practice by which the patient transfers feelings toward everyone else to the doctor, who then must react with a proper response, the counter-transference, in order to avoid emotional involvement and assist the patient in overcoming problems. There was also expert testimony that McCabe's drug treatment and his sexual involvement with his patient, a mishandling of Greenberg's transference, was treatment below the standards of the medical profession. The jury was charged on the law of medical malpractice.

Special interrogatories were submitted to the jury. (Stipulation # 31; Exhibit G–3 to Stipulation of Facts). The jury returned a verdict upon special interrogatories as follows:

### INTERROGATORIES TO THE JURY

1. Was the defendant negligent in his treatment of the plaintiff as a patient?

YES __X__   NO _____

If you answer this question "NO", sign this interrogatory and return to Court.

2. If you answer Interrogatory #1 "YES", was that negligence a substantial factor in causing harm to the plaintiff?

YES __X__   NO _____

If you answer this question "NO", sign this interrogatory and return to Court.

3. Was there any negligence on the part of the plaintiff which contributed to any harm that she may have suffered?

YES _____   NO __X__

4. If you have answered question #3 "YES", was such negligence a substantial factor in bringing about her harm?

YES _____   NO __X__

If you have answered questions #3 and #4 "YES", sign this interrogatory and return to Court.

5. If you have answered questions #1 and #2 "YES" and questions #3 and #4 "NO",

then in what amount do you assess compensatory damages, exclusive of future psychiatric care, in favor of the plaintiff?

$275,000.00

6. If you have answered question #1 and #2 "YES", and #3 and #4 "NO", what amount, if any, do you award the plaintiff for future psychiatric care?

$90,000.            365,000

7. If you have answered questions #1 and #2 "YES", was Dr. McCabe's treatment of the plaintiff performed with bad motive or was it outrageous or with reckless indifference to the interest of Mrs. Greenberg?

YES _X_    NO ____

8. If you have answered question #7 "YES", what amount do you award Mrs. Greenberg as punitive damages?

$300,000.

9. Do you find that a person in Mrs. Greenberg's mental and physical condition (as you find it to have been), knew or should have known before January 5, 1974 that she was suffering harm as a result of the defendant's conduct?

YES ____    NO _X_

By Order dated September 16, 1977, judgment was entered in *Greenberg v. McCabe* in favor of Greenberg and against McCabe

in the amount of $665,000.00, together with interest and costs. (Stipulation # 32; Exhibit G–4 to Stipulation of Facts). Defense counsel Joseph moved for judgment notwithstanding the verdict (n.o.v.) or for a new trial on behalf of McCabe (Stipulation # 34); by order dated June 16, 1978, in No. 76–342, the judgment of $665,000.00 was reduced in the amount of $90,000.00 (the amount awarded by the jury for future psychiatric care), and a judgment was entered for Greenberg in the amount of $575,-000.00 together with interest and costs. (Stipulation # 35, Exhibit G–5 to Stipulation of Facts).

Both Greenberg and McCabe appealed. The Court of Appeals for the Third Circuit entered a Judgment Order affirming the judgment of the district court on February 27, 1979. (Stipulation # 37; Exhibit G–6 to the Stipulation of Facts). By Order dated October 1, 1979, the United States Supreme Court denied McCabe's Petition for a Writ of Certiorari. (Stipulation # 38).

■ Aetna commenced this diversity action[1] seeking a declaration that McCabe was not entitled to insurance coverage for

---

1. We have determined that Pennsylvania law applies in this diversity action. As our jurisdiction is based upon diversity of citizenship, we are required to apply the choice of law rules of the forum state, Pennsylvania. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; *Jamison v. Miracle Mile Rambler, Inc.,* 536 F.2d 560 (3d Cir.1976). The Third Circuit has determined that the Pennsylvania Supreme Court would extend the flexible conflicts methodology adopted for tort actions in *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964) to contract actions. *Melville v. American Home Assurance Co.,* 584 F.2d 1306 (3d Cir.1978) (insurance contract); see, *Jewelcor Inc. v. St. Paul Fire & Marine Insurance Co.,* 499 F.Supp. 39 (M.D.Pa.1980) (applying *Griffith* conflicts analysis to interpretation of insurance contract). This conflicts analysis "takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction." *Melville v. American Home Assurance Co.,* 584 F.2d at 1311.

Under such an analysis, Pennsylvania law applies since the most significant contacts are with this state. Greenberg is a resident of Pennsylvania, the insured-against risk allegedly occurred in Pennsylvania where Dr. McCabe's medical practice was located at the time he

treated Greenberg. Aetna is licensed to do business in Pennsylvania. Pennsylvania has an interest in prescribing the standards that will govern insurance contracts purchased by its residents. This state interest seems particularly weighty with regard to medical malpractice insurance policies covering physicians practicing in the state. *See, Melville, supra* at 1313–14 (state has an interest in having its rules applied to insurance contracts purchased by its residents). No jurisdiction other than Pennsylvania has any state policy to vindicate on these facts.

Even under the former Pennsylvania conflicts rule which would interpret every contract under the law of the place of contracting, Pennsylvania law would apply. The place of contracting in the case of an insurance policy is the place of contract delivery. In the absence of proof as to where the policy was delivered, it is presumed that delivery took place at the insured's residence which was Pennsylvania at the time here relevant. *Jamison, supra; Pacific Indemnity Co. v. Linn,* C.A. No. 79–699, slip. op. at 12–13 (E.D.Pa. July 24, 1981); *Crawford v. Manhattan Life Insurance Co.,* 208 Pa.Super. 150, 221 A.2d 877 (1966); *Eastcoast Equipment Co. v. Maryland Casualty Co.,* 207 Pa.Super. 383, 218 A.2d 91 (1966).

any judgment against him as a result of his contact or conduct with Gale Greenberg. Aetna maintains that Dr. McCabe's association with Greenberg did not constitute the provision of professional services.

> From beginning to end, McCabe's conduct towards Greenberg was not that of an osteopath attempting to practice his profession. At best, it was an indulging of McCabe's own perversions and "hangups." At worst it was a scheme of experimentation, which involved the intentional infliction of injury, masquerading as psychiatric treatment.

Plaintiffs' Pretrial Memorandum at p. 15.

## II. *Collateral Estoppel*

■ Summary judgment may be granted only if the pleadings, depositions, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Any doubt as to the existence of a genuine issue of fact must be resolved in favor of Aetna, the party opposing the motion. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). However, summary judgment may be appropriate where there exists a judgment in a prior adjudication binding upon parties to a subsequent lawsuit. *See, Somportex Limited v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3d Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972).

■ In answers to interrogatories in response to the trial judge's charge on the tort of medical malpractice, the jury found a fact determinative of coverage under the Aetna policy. The jury determined that Dr. McCabe was "negligent in his *treatment*" of Greenberg "*as a patient*" and that "that negligence" was "a substantial factor in causing harm to" Greenberg. (Jury's answers to Interrogatories # 1 and # 2, *Greenberg v. McCabe,* No. 76–342) (emphasis supplied). In these circumstances, Aetna is collaterally estopped from denying that McCabe's association with Greenberg was one "arising out of the rendering of or failure to render, during the

policy period, professional services by the individual insured" within the meaning of those words in McCabe's policy with Aetna.

■ Collateral estoppel applies where the issue in question was decided in the first trial. It may apply in the context of an insurance coverage dispute occurring subsequent to a judgment against an insured. *Renschler v. Pizano,* 329 Pa. 249, 198 A. 33 (1938) (judgment against insured is conclusive on the issues there determined in a subsequent suit by the insured against the insurer for indemnity). This Court stated the Pennsylvania rule in *Ransburg Corp. v. Automatic Finishing Systems, Inc.,* 412 F.Supp. 1357, 1363 (E.D.Pa.1956), citing Section 84 of the Restatement of Judgments:

> [a] person who is not a party but who controls an action individually or in co-operation with others, is bound by the adjudications of litigated matters as if he were a party if he had a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction...

■ It is apparent that Aetna controlled the entire course of the underlying litigation through its counsel, Edward Joseph, and that, as Dr. McCabe's insurer, Aetna had a financial interest in the outcome of the lawsuit. The parties have stipulated that Aetna retained Kaliner & Joseph and that Joseph represented McCabe throughout the proceedings in *Greenberg v. McCabe.* The record is clear that Dunn, McCabe's personal attorney, did not participate in the trial. Under the doctrine of collateral estoppel, Aetna is consequently bound by the adjudication of the matters actually determined in *Greenberg v. McCabe.* However, the parties dispute what the jury actually did determine.

■ A litigant cannot be foreclosed from litigating issues decided by a prior judgment where it did not have a full and fair opportunity to be heard in the prior action. *Vaksman v. Zurich General Accident & Liability Insurance Co.,* 172 Pa.Super. 588, 94

A.2d 186 (1953) (judgment rendered against an insured on the basis of negligence does not preclude the insurer in a subsequent action on the policy for indemnity from asserting that the injured party's damages were intentionally, not accidentally, inflicted by the insured and thus not within the purview of the policy). Aetna maintains that the jury did not decide, and it is not foreclosed from arguing that McCabe's conduct occurred in pursuit of his own personal needs and desires, rather than in the course of his profession and McCabe's conduct was intentional, not merely negligent.

It is clear from the record in *Greenberg v. McCabe* that Aetna, through attorney Joseph, had a full and fair opportunity to raise the defense that McCabe's activities did not constitute professional services and that, in fact, Joseph vigorously presented precisely that defense.

In Joseph's deposition, he outlined his theories of the defense of Dr. McCabe:

A. I had two theories in the case, Mr. Fine. I think if we take it from the beginning, it probably develops better.

When the complaint came in, it was my opinion at that point that it was a medical malpractice claim, the way it was framed, with Dr. McCabe negligently doing this or that or negligently not doing this or that. As things developed, I decided—I made these decisions I made as a lawyer, that if I could convince the jury there is no physician-patient relationship, you know, that should result in a defendant's verdict, which would have been my primary job for Dr. McCabe.

The alternative position was that if the physician-patient relationship did exist, that it did terminate at some point in time which would have been barred by the Pennsylvania Statute of Limitations of two years.

Q. So those were your theories?

A. Yes.

Joseph deposition, dkt. # 79, at pp. 81, 82.

The trial record in C.A. 76–342 confirms Joseph's theory of defense at all stages of the proceeding. Joseph requested a voir dire question regarding "[w]hether physicians have imposed upon them a standard of *personal behavior* which is greater than other persons." (76–342, N.T. 2–5) (emphasis supplied).

In his opening speech to the jury, Joseph stated:

Ladies and gentlemen, our evidence will show to you that long, long ago, at least back in 1972, in 1973, Mrs. Greenberg knew full well what her relationship was with Dr. McCabe. *Call it boy-girl, call it lover, call it what you want, but it was not the physician and patient relationship,* and that she knew about it. (N.T. 2–27) (emphasis supplied).[2]

Joseph objected to questions inconsistent with his theory that McCabe and Greenberg were not physician and patient. For example, he stated at N.T. 2–42, 2–43, during McCabe's testimony:

Q. Would you give me the name of a single article printed anywhere in the world that accepts a therapist having sexual relations with the patient and as creating an advantage to the patient.

MR. JOSEPH: Objection, sir. The doctor's testimony has been that this was not the physician-patient relationship when they were having this sexual act, and therefore that question is, you know, an objectionable question.[3]

Joseph's cross-examination was consistent with his defensive strategy that McCabe

---

**2.** Joseph reiterated this in various ways throughout his opening speech. He stated that, "it was one that was a personal relationship between two people who had an affection for each other, whose emotions expressed themselves to each other, and who responded to each other as they did." (N.T. 2–23—2–24). Again, "the two of them exchanged rings in anticipation of what their future might be together, not as physician and a patient, but obviously as two people who had come to express a feeling for each other..." (N.T. 2–26). Joseph summarized for the jury, "[t]his was not a physician-patient relationship all these years." (N.T. 2–29).

**3.** Mr. Joseph objected upon similar grounds throughout the course of the trial. See, e.g. N.T. 2–46; N.T. 2–85.

was not rendering professional services. For example, Joseph cross-examined Dr. Altaker, a psychiatrist who also treated Greenberg, about the nature of her relationship with McCabe as she herself saw it:

Q. That uses the word "affair," correct?

A. Yes.

Q. That came from Mrs. Greenberg herself to you?

A. That is correct.

. . . .

Q. I think she described Dr. McCabe as a paramour at one point in that hospital chart, didn't she?[4]

(N.T. 2–90, 2–91).

Joseph's closing argument to the jury developed this defense, common to the interests of both Aetna and McCabe, that McCabe was not rendering professional services to Greenberg but was pursuing a personal relationship.

Ladies and gentlemen, a lover by any other name is a lover. You know what the definition of a paramour is. We know what that definition is. It is a definition, it is word that is used commonly, and I am not saying—it is commonly used, it is a word that is in common use as to the relationship between two people especially where one of them is married, and Mrs. Greenberg at the time was still married. You know, that is exactly what the facts were, and the word "paramour" within the dictionary definition fits right into that relationship. An illicit relationship between two people, especially where one of the two persons is married.

(N.T. 6–114).[5]

In *Zipkin v. Freeman,* 436 S.W.2d 753 (Mo.1968), the Supreme Court of Missouri decided that an insurance company which did not defend the patient's malpractice action against its insured did have a duty to defend and was also liable to indemnify the insured under the policy. That case involved a psychiatrist's medical malpractice in the mishandling of the transference phenomenon, an affair, and a live-in arrangement with a patient. The *Zipkin* court pointed out that had the insurance company defended, its defense that no medical professional services were in fact provided was completely consistent with the defense of its insured.

Defendant could have litigated the issue in the damage suit of whether the resulting damage was directly and proximately caused by the professional services or lack of them. If the connection was too tenuous or if the particular acts of Dr. Freeman stressed by defendant were not relevant to any professional services of a psychiatrist, defendant could have raised the point by objecting to such evidence in the defense of the damage suit and keeping it away from the jury entirely. This defense would have been consistent with

---

**4.** Joseph's cross-examination of Dr. Altaker emphasized the personal relationship theory at several points. E.g., N.T. 2–102:

A. If she were to ask me whether or not she should still be seeing Dr. McCabe, I would be inclined to—

Q. Seeing him in what sense?

A. In an affair or in a sexual sense, in a dating relationship, a romantic relationship—

N.T. 2–104:

Q. And she did continue therapy with you at that time?

A. Right.

Q. And no one can be treated by two psychiatrists at the same time, can they, Doctor?

A. Right, they cannot.

N.T. 2–106:

Q. You took that to be the relationship of two people living together, what we will call the boy-girl or the lover relationship?

N.T. 2–112:

Q. Vis-a-vis the boyfriend relationship, you know, the boy-girl relationship.

A. Yes.

N.T. 2–127:

Q. You also said you were not aware of seeing, of her seeing him in a professional capacity, and we established that you don't see two psychiatrists for treatment at the same time, correct?

A. Yes.

Q. She was your patient.

A. Right.

**5.** Joseph's closing emphasized the non-professional relationship defense. E.g., N.T. 6–105, 6–113, 6–133, 6–134, 6–135.

the mutual interests of Dr. Freeman and the insurer. However, this sort of defense needed to be presented in the trial court and defendant, of course, having elected not to defend, is in no position now to raise a matter which could have been raised there.

*Zipkin,* 436 S.W.2d at 763.

Here, a defense precluding coverage under Aetna's policy was in fact placed before the jury by Aetna's own attorney, Edward Joseph. The jury was asked, "was the defendant negligent in his treatment of the plaintiff as a patient?" And it answered, "yes." This interrogatory is not stated in the exact words of Aetna's policy coverage declaration but it constituted a finding that the damages awarded as a consequence of that negligence were "because of injury arising out of the rendering of or failure to render ... professional services by the individual insured."

■ The opinion of the trial court in *Hartogs v. Employers Mutual Liability Co.,* 89 Misc.2d 468, 391 N.Y.S.2d 962 (N.Y.Sup. Ct.1977), cited by defendants, is neither binding nor persuasive. In *Hartogs,* another case involving sexual therapy by a psychiatrist, the court held that an insurer was not liable because the insured had not provided it with due notice of the claim against him. The court then stated that the jury's finding of medical malpractice would apply only to the patient's claim against the doctor and would not impose liability on the insurer under a malpractice policy because the doctor knew what he was doing was not pursuant to a doctor-patient relationship. The coverage of the insurance policy in *Hartogs* is unstated. Here, the policy covers injury "arising out of" the provision of professional services, which is even broader than the interrogatory answered by the jury. See, *Aetna Casualty & Surety Co. v. Ocean Accident & Guarantee Corp.,* 386 F.2d 413 (3d Cir.1967) (per curiam) ("arising out of" means causally connected with, not proximately caused by; but for causation is enough); *Blue Bird Body Co. v. Ryder Truck Rental,* 583 F.2d 717 (5th Cir.1978) ("arising out of" is much broader than

"caused by"). At trial, Aetna conceded that a valid doctor-patient relationship existed between McCabe and Greenberg at one time. N.T. 6–122. McCabe's conduct arose out of the provision of professional services and is covered by his malpractice policies. A policy of insurance is a contract of adhesion, requiring strict construction against its author, here Aetna. *Aetna Casualty,* 386 F.2d at 415 (phrase "arising out of" is very broad and vague and therefore must be construed strictly against the insurer); *Kraus v. Allstate Insurance Co.,* 379 F.2d 443 (3d Cir.1967); *Oliver B. Cannon & Son, Inc. v. Fidelity Casualty Co.,* 484 F.Supp. 1375 (E.D.Pa.1980).

■ Therefore, we conclude that Aetna raised the defense of nonprofessional conduct in *Greenberg v. McCabe,* that it had an interest in doing so, and that it is now barred from relitigating the adverse jury determination on that issue. We reach a different result on Aetna's other contention that whether McCabe's medical malpractice was intentional, rather than negligent, was unlitigated. Aetna did not have the opportunity in *Greenberg v. McCabe* to raise the defense that McCabe had intentionally injured Greenberg in the course of practicing his profession.

*Vaksman v. Zurich General Accident & Liability Insurance Co.,* 172 Pa.Super. 588, 94 A.2d 186 (1953) a case where the insurance company had refused to defend, presented this question:

Does a judgment rendered against the insured on a basis of negligence preclude or prevent the insurer in a subsequent action on the policy for indemnity from asserting as a defense that the injured party's damages were the result of intentional harm and not accidental and hence not within the purview of the policy?

The Superior Court answered the question in the negative because:

Opportunity to defend, means an opportunity to appear and interpose to the pending action any defense it might have. That damage was intentionally done by the insured certainly would be no defense to the action against it.

*Vaksman,* 172 Pa.Super. at 590, 94 A.2d at 189.

■ Aetna is not barred or collaterally estopped from raising the defense that McCabe's medical malpractice was intentional conduct covered by his insurance policy. Therefore, we must consider whether McCabe's policy with Aetna covers intentional malpractice and, if so, whether the defense against coverage for an insured's intentional torts has been waived.

## III. Intentional Conduct

### A. Coverage

Aetna claims that even if McCabe's conduct was an "injury arising out of the rendering of or failure to render, ... professional services ...", it is not liable because the policy excluded conduct constituting an intentional tort. The policy contains only one express exclusion; it is not for intentional injury. The policy does not require that the injuries covered must have been accidentally inflicted. Aetna relies on the court to imply an exclusion that it. could have, but did not expressly provide.

■ Pennsylvania courts have been reluctant to imply an exclusion [6] in the absence of significant considerations of public policy. In *Eisenman v. Hornberger,* 438 Pa. 46, 264 A.2d 673 (1960), a homeowner's liability policy contained no exclusion from coverage for a "violation of law"; the Supreme Court allowed recovery for property damage as a result of acts performed by an insured in the course of committing a crime. The Court stated:

> [i]n view of the fact that Royal could easily have provided for situations such as the one before us by including a "violation of law" clause in its policy, we are loath to insert such a clause for the greater protection of the insurer where we are

not confronted with an overriding public policy which would so dictate.

*Eisenman,* 438 Pa. at 51, 264 A.2d at 675.

A public policy precluding insurance for intentional torts was mentioned in *Wilson v. Maryland Casualty Co.,* 377 Pa. 558, 105 A.2d 304 (1954) and *Esmond v. Liscio,* 209 Pa.Super. 200, 224 A.2d 793 (1967). In *Wilson,* the Court stated in a footnote: "Of course a person *could not* contract for indemnity against liability for damage or injury caused by his own willful act, .... A contract to insure against liability would obviously be void as being in violation of public policy." *Wilson,* 377 Pa. at 589 n. 1, 105 A.2d 304, 305 n. 1. But in *Wilson,* a duty to defend case, the insurance policy applied to injury "caused by accident" and provided that "[a]ssault and battery shall be deemed an accident unless committed by or at the direction of the insured." The insured had personally assaulted another and the court held that assault was specifically excluded by the terms of the policy; it was not necessary for the court to decide if public policy precluded insurance of such conduct. *Esmond* was a garnishment proceeding on a liability policy for bodily injury "caused by accident." Assault was deemed an "accident" under the policy unless committed by the insured. The court held that liability arising directly from a willful, intentional and criminal assault by an insured, including punitive damages, was excluded from coverage.

Public policy considerations involved in insuring wrongful conduct were discussed in the *Eisenman* case in regard to insurance coverage for damage occasioned during criminal activity.[7] Because the court there held that the language in the insurance contract did not exclude liability for criminal conduct, the court was required to consider whether public policy precluded recovery. The policy considerations specifically

---

**6.** In addition, under Pennsylvania law, an insurer cannot enforce an exclusion from liability unless it has explained the exclusion to the policyholder or if he was otherwise made aware of it. *Pacific Indemnity v. Linn,* C.A. No. 79–699, slip op. at 13 (E.D.Pa. Nov. 2, 1982); *Hionis v. Northern Mutual Ins. Co.,* 230 Pa.Super. 511, 327 A.2d 363 (1974).

**7.** Although *Eisenman* discussed public policy considerations involved in insuring conduct constituting a crime, the same reasoning applies to intentional torts.

mentioned were whether the policy was procured in contemplation of the wrongful conduct, whether the insurance policy might be said to have promoted the wrongful act, whether denying coverage would serve as a deterrent, and whether the insurance policy saves the insured from the consequences of his wrongful act. *Eisenman,* 439 Pa. at 50, 264 A.2d at 274. Finding none of these considerations present where the insured's negligent use of matches in the course of a burglary caused a fire destroying the premises entered and robbed, the court allowed recovery on the policy to the garnishor. *See also, Mohn v. American Casualty Co.,* 458 Pa. 576, 326 A.2d 346 (1974); *Vigilant Ins. Co. v. Kambly,* 114 Mich.App. 683, 319 N.W.2d 382. The first three of these considerations do not appear to be implicated in this case. There is nothing to suggest that insurance was procured in contemplation of or promoting the wrongful act; nor is there a reasonable basis for belief that denying coverage will have any deterrent effect on conduct of this nature. The problem is whether having insurance coverage will save the insured from the consequences of his wrongful act; certainly it may have some financial consequences.

But the Pennsylvania Supreme Court has recognized that "most of those jurisdictions that still embrace the public policy argument as a basis for denying recovery . . . provide an exception where the suit is being brought by an innocent beneficiary." *Mohn,* 458 Pa. at 584–85, 326 A.2d at 351. In *Mohn,* the plaintiff was allowed to recover on two insurance policies for expenses incurred as a result of his son's hospitalization where his son was fatally injured by police while attempting to flee the scene of a burglary. Similarly, in *Eisenman,* innocent victims of a burglary were allowed to recover from a burglar's insurer for damage in the course of the burglary. *Esmond* denied recovery to an innocent victim of an intentional tort, but the policy covering accidents explicitly excluded from coverage assault by the insured. If viewed as a denial on public policy grounds, the authority of this Superior Court case is called into

question by the later Supreme Court decisions in *Eisenman* and *Mohn.* *See also, Roque v. Nationwide Ins. Co.,* 292 Pa.Super. 117, 436 A.2d 1033 (1981).

In this case, Gale Greenberg, one of the individuals who will benefit from recovery from the insurer was found by the jury to be an innocent victim of medical malpractice (Interrogatory 3); Aetna is collaterally estopped from relitigating that issue, on which it also defended and which was decided adversely to it at the previous trial. Although Pennsylvania has a policy interest in deterring intentional torts by barring insurance recovery for them by the tortfeasor, it also has a strong interest in compensating Pennsylvania victims of malpractice for injuries suffered at the hands of Pennsylvania physicians; the practice of the medical profession is highly regulated by the state and residents' health and safety is a major concern. Malpractice may be negligent but is also on occasion intentional. Dr. McCabe's policy covered injuries arising out of the rendering, as well as failure to render, professional services. In a sense, all rendering of service is intentional and failure to render may be intentional or unintentional. No distinction is explicitly found in the policy and none should be implied. Accordingly, the court holds that even if Dr. McCabe's malpractice was intentional, it is covered by his insurance policy with Aetna.

### B. *Waiver*

McCabe contends that Aetna has waived its right to raise the defense of intentional misbehavior because Aetna's attempted reservation of rights was untimely and did not fairly apprise McCabe that it was reserving the particular defense of non-coverage for intentional conduct.

The complaint in *Greenberg v. McCabe* was filed on January 15, 1976, and McCabe notified Aetna on March 23, 1976. On March 31, 1976, Aetna retained the firm of Kaliner & Joseph to represent McCabe and sent McCabe a letter informing him that a verdict in excess of the policy limits was

possible, that punitive damages had been demanded and that "[a]ccording to current Pennsylvania law it is against public policy for an Insurance Carrier to pay that portion of a judgment allocable to punitive damages against a Tort Feasor." (Exhibit G–10 to Stipulation of Facts). For these reasons, Aetna informed McCabe, that he might be "at liberty to associate your own personal counsel, at your own expense, in defense of this suit." *Id.*

It is plain from Aetna's report of suit of July 13, 1976 (Exhibit G–34 to Stipulation of Facts) that it was aware of the factual basis for Greenberg's suit and had concerns regarding coverage at that time.

> As noted this is a Advice of Suit Report, there was a claim within the suit in which the claimant was making a demand for punitive damages. The punitive damage portion of the complaint had been denied by letter to our named Insured.

> Also, depending on the results of our Insured's version, and the specific allegations of the claimant's attorney there may be other coverage questions pertaining to this loss.

. . . .

> The malpractice involved here stems from a relationship that developed between our named Insured and one of his patients. The patient, Gale Greenberg, apparently was treating with our Insured for some mental problems she was having. As a result of her relationship with Dr. McCabe she basically became his mistress and apparently was residing with him for approximately a year and half prior to the date of accident. The malpractice appears to be the treatment of this claimant by our Insured with drugs along the nature of uppers and downers to control her different emotional states. On the date of the accident which we will go into more detail, the Insured is alleged to have caused injuries to this claimant when he awoke her during the middle of the night

in order to have sexual relations. As a result of an incident that happened that night, claimant apparently sustained a fractured skull. Please see Insured and Claimant's versions for some more details concerning the night of February 11th, 1974.

. . . .

> We also have to determine whether or not the claimant under these circumstances was a patient rather than a girlfriend of our Insured, and whether or not the malpractice occurred within the terms of our policy of insurance.

Regardless of this knowledge, Aetna did not attempt to reserve its rights under the policy until March 11, 1977, three days before the March 14th trial date originally scheduled.

The general rule regarding a liability insurer's waiver of defenses is that "a liability insurer, by assuming the defense of an action against the insured, is thereafter estopped to claim that the loss resulting to the insured from an adverse judgment in such action is not within the coverage of the policy, or to assert against the insured some other defense existing at the time of the accident." 38 A.L.R.2d 1148, 1150 (1954).[8] This is the rule in Pennsylvania:

> Under Pennsylvania law, it is the general rule that an insurance company may not undertake the defense of a suit which entails the defendant's relinquishing to the company the management of the case and then turn around and deny liability under the policy.

*Jones v. Robbins,* 258 F.Supp. 585, 588 (E.D. Pa.1966), *aff'd,* 374 F.2d 1002 (3d Cir.1967) (adopting District Court's reasoning); *Basoco v. Just,* 154 Pa.Super. 294, 35 A.2d 564 (1944).

The insurance company may protect itself by a timely reservation of rights under the policy which fairly informs the insured of the insurer's position. *See,* 38

---

**8.** Liability insurance: insurer's assumption of or continuation in defense of action brought against the assured as waiver or estoppel as

regards defense of noncoverage or other defense existing at time of accident.

A.L.R.2d 1148, 1167 (1954); *Vaksman,* 172 Pa.Super.Ct. at 592; 94 A.2d at 188 (insurance company "may be able to reserve the defense of non-coverage for a subsequent suit under a non-waiver agreement"); *Speier v. Ayling,* 158 Pa.Super. 404, 45 A.2d 385 (1946) (insurer's defenses under policy not waived where insured requested insurer to defend and agreed that such defense was without prejudice to the insurer's disclaimer of liability).

Neither the requirement of timeliness or adequate notice to the insured was met by Aetna in this case. Aetna, aware of the underlying facts, waited until three days prior to the original trial date to attempt to disclaim coverage. This denied McCabe some information relevant to the extent he should have used his personal attorney to assist investigation of the case and pretrial discovery. McCabe had less occasion to direct his attorney to do so prior to the disclaimer since it was reasonable to believe that Aetna's interests coincided with his own. Aetna's interest in obtaining a defense verdict or the lowest possible compensatory damage award was consistent with his interest in avoiding personal liability from an award in excess of the policy limits or for punitive damages.

Aetna's disclaimers did not fairly inform the insured that the insurer disclaimed liability for intentional malpractice. Aetna's letters reserved . . . "rights to disclaim coverage for any damages . . . incurred at any time that did not arise out of professional services rendered by you (McCabe) or professional services that you failed to render." (Exhibit G–31 to Stipulation of Facts). Aetna attempted to reserve rights because McCabe's conduct was not the practice of medicine but not because McCabe had intentionally committed the tort of medical malpractice or any other tort. The attempted reservation of the professional services defense did not alert McCabe to the conflict of interest problems he had with his insurer and his need to protect himself; the insurer was actively defending against liability on the ground no medical professional service was rendered. Therefore, McCabe had reason to rely on collateral estoppel to prevent a denial of coverage if there were an adverse verdict as to compensatory damages awarded by the jury to the extent of the policy limits. A specific reservation of rights as to intentional conduct would have alerted McCabe to the greater necessity of protecting his own interests because of the greater possibility of a post-verdict dispute with his insurer; no such reservation was ever made.

Aetna did not reserve the defense that intentional malpractice was not covered by McCabe's policy in a manner sufficient to apprise the insured of its position. Accordingly, Aetna may not now disclaim coverage for intentional conduct by Dr. McCabe.[9]

## IV. Damages Covered; Policy Limits

### A. Punitive Damages

The jury awarded Gale Greenberg $300,000 in punitive damages because it found that Dr. McCabe's treatment of her "was performed with bad motive or was outrageous or was performed with reckless indifference to her interest." Aetna contends that it is not liable for the award of punitive damages under its policy because public policy in Pennsylvania prohibits payment of a punitive damage award by an insurer. Aetna is correct that public policy precludes Aetna's liability for punitive damages.[10]

---

**9.** Because the court concludes that Aetna never reserved its rights on the defense of intentional conduct, the court finds it unnecessary to decide whether McCabe would have been prejudiced by such a reservation.

**10.** Aetna reserved its rights with regard to the punitive damages. Aetna immediately notified McCabe that Pennsylvania law did not allow coverage for punitive damages and advised him that he might wish to consult a private attorney. The defendants argue this reservation was invalid because the policy did not explicitly provide for any reservation of rights. Since the payment of punitive damages on behalf of the tortfeasor by the insurer is invalid and against public policy, it is unnecessary to decide this issue.

The Pennsylvania Supreme Court has not specifically addressed this issue. The most recent statement by the Superior Court was in the case of *Esmond v. Liscio*, 209 Pa.Super. 200, 224 A.2d 793 (1966). In that case, the Court stated in dicta that

[w]e agree with the court below that public policy does not permit a tortfeasor, in these circumstances, to shift the burden of punitive damages to his insurer. Pennsylvania adheres to the orthodox view that punitive damages are in no sense intended as compensation to the injured plaintiff. They are, rather, a penalty, imposed to punish the defendant and to deter him and others from similar "outrageous" conduct.

*Id.* 212, 224 A.2d at 799.[11]

Defendants cite several more recent cases from other states in which courts have rejected the argument that public policy precludes insuring against punitive damages. They argue that because the Pennsylvania Supreme Court has not decided the matter, because *Esmond* was decided in 1966, and because there is support in other jurisdictions for allowing such recovery from an insurer, this court should predict that the Pennsylvania Supreme Court would now permit recovery from an insurer of an award of punitive damages.

This court, sitting in a diversity case, must apply the law of Pennsylvania and is bound to follow the law of that state. Although the Superior Court decision in *Esmond* is not controlling on this court, it is entitled to "some weight" and is a "datum for ascertaining state law," *Comm'r v. Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), particularly where, as here, the policy considerations supporting the decision have been expressly adopted by the Pennsylvania Supreme Court. *See also,*

*Safeco Ins. Co. v. Wetherill*, 622 F.2d 685 (3d Cir.1980).

The law in Pennsylvania is clear on the circumstances in which an award of punitive damages is permitted. "Punitive damages are damages, other than compensation, or nominal damages, awarded against a person to punish him for his outrageous conduct." *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963), quoting Restatement of Torts, § 908(1). *See also, Focht v. Rabada*, 217 Pa.Super. 35, 268 A.2d 157 (1970); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979); *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255 (E.D.Pa.1976). "Punitive damages are awarded only for outrageous conduct, . . . for acts done with a bad motive or with a reckless indifference to the interests of others." *Chambers, supra,* quoting Restatement of Torts, § 908(1), comment (b). The court in *Esmond* relied on these policy considerations in stating that public policy forbade insurance recovery on such damages; the jury in *Greenberg v. McCabe* was instructed on these policy considerations by the trial judge. N.T. 7–18. Such policy considerations would be frustrated if a tortfeasor were allowed to insure himself against an award of punitive damages.

In view of the clear purpose of an award of punitive damages and the rationale of Pennsylvania lower court decisions holding that insurance covering punitive damages is against public policy, there is no reason to believe that the Pennsylvania Supreme Court would not reach the conclusion of the court in *Esmond* that it is the tortfeasor who is to be punished and not his insurer. Therefore, the insurance policies issued by Aetna cannot cover punitive damages awarded against Dr. McCabe.[12]

---

**11.** Although the court in *Esmond* stated that the specific circumstances of that case, reckless driving, made the public policy considerations compelling, we do not agree with defendants that this makes the case distinguishable from the case at bar.

**12.** In holding Aetna not liable for punitive damages on its insurance coverage for reasons of

public policy, the court does not yet decide Dr. McCabe's claim that Aetna is liable to him for an amount equal to the award of punitive damages because of its breach of fiduciary duty in its representation of him at trial. That issue is to be addressed in the next phase of the proceedings in this case.

**B.** *The Amount of Aetna's Liability Under the Limits of Liability Provision*

The insurance policies at issue provide that Aetna is liable as follows:

> The limit of liability stated in the declarations as applicable to "each claim" is the limit of the company's liability for all damages because of each claim or suit covered hereby. The limit of liability stated in the declarations as "aggregate" is, subject to the above provision respecting "each claim," the total limit of the company's liability under this coverage for all damages. Such limits of liability shall apply separately to each insured.[13]

A policy containing this same provision was in effect for each year (1968–1974 inclusive). The meaning of the phrase "each claim or suit" is at issue. Aetna maintains that Gale Greenberg's judgment against Dr. McCabe constituted but one claim against him so that its coverage is limited to $250,000. Defendants McCabe and Greenberg contend that "each claim" is for each year that the policies were in effect. They argue that "each claim" must be read in light of the provision covering "injury arising out of the rendering or failure to render [professional services], during the *policy* period;" because McCabe engaged in malpractice in each of six years of policy coverage, it is contended that Greenberg had a "claim" against him for malpractice in each of those years. Defendants further argue that Aetna could have explicitly limited coverage for a single claim continuing across policy years but failed to do so.[14]

■ An ambiguity in the terms of an insurance policy is to be construed against the insurer. *Thomas v. Metropolitan Life Ins. Co.*, 388 Pa. 499, 131 A.2d 600 (1957) (per curiam). But this principle is not applicable where the policy provisions are not ambiguous. *Id.* 388 Pa. 518, 131 A.2d 605;

*Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co.*, 431 F.Supp. 1160 (E.D.Pa.1977), aff'd 583 F.2d 650 (3d Cir.1978).[15] "An insurance policy should be construed according to the plain meaning of the words used, so as to avoid ambiguity while at the same time giving effect to all of its provisions." *Treasure Craft id.* 1163.

■ Although defendants' position has some appeal, we find that they are attempting to create an ambiguity in the phrase "each claim or suit" where an ambiguity does not exist. Under the plain meaning of the phrase "each claim or suit," even when read in the context of six policies, Greenberg had only one claim or suit against Dr. McCabe. Greenberg has brought one lawsuit against Dr. McCabe for his course of conduct over a six year period. Contrary to defendants' assertion, it cannot now be argued that she could have sued every year at the end of the year for malpractice committed therein; in asserting the defense of the statute of limitations (which was in the common interest of both McCabe and Aetna), Greenberg's lack of knowledge of the existence of the malpractice prior to 1974, and her lack of contributory negligence in allowing it to continue from year to year have been litigated and were determinative of liability in the underlying litigation. The parties are bound by the jury's finding that Greenberg was not aware, nor should she have been aware, of the malpractice before January, 1974.

The jury found she could sue in 1976 for the damages she suffered from defendants' malpractice in prior years. But the medical malpractice over the course of the years 1968–1974, for which the jury returned a verdict against Dr. McCabe constituted one claim even though the conduct may have occurred over several years. The jury was

---

**13.** Aetna's liability for "each claim" is $250,000 and for "aggregate" claims is $500,000.

**14.** Since Aetna's policy cannot cover the $300,000 award of punitive damages for reasons of public policy, the total amount of the verdict reimbursable under the policy is the compensatory damages award in the amount of $275,000. The amount of coverage presently at issue,

excluding interest and costs, is $25,000, the difference between the award of $275,000 and the limit of liability provision of $250,000.

**15.** The parties have not cited any Pennsylvania case in support of their interpretation of the "each claim or suit provision" in the context of a continuing tort.

not asked to consider separate torts in several years and did not award damages for separate claims in each year. When confronted with this identical issue, the court in *Zipkin* stated, "Dr. Freemans' acts and omissions *continuously* occurred over the three-year period. His was a *continuing tort* for which respondent would have *one* claim (for all damages which had previously been occasioned her, and for all future damages) arising out of Dr. Freeman's wrongful acts." *Zipkin, supra,* 436 S.W.2d at 764.[16]

Otherwise, the amount of an insurer's liability for continuing torts would turn on the fortuity of which days of the year the tort happened to continue. If a continuing tort lasted two days within one policy period, there would be liability for one claim but if the same two day tort occurred on the last day of the first policy and the first day of the second policy, there would be liability for two claims. A construction of the policies leading to such a result would be inequitable. *See, Bernat v. Socke,* 180 Pa.Super. 512, 118 A.2d 253 (1955).[17]

▆ The court also rejects the argument of McCabe that Greenberg asserted two theories of liability for malpractice, mishandling of the transference phenomenon and improper drug treatment, so that Greenberg had two claims against McCabe and thus the aggregate limit of $500,000, rather than the "per claim" limit of $250,-000, should apply. Defendant is incorrect because the theories of liability asserted by Greenberg are irrelevant to coverage. Each theory does not give rise to a separate claim for malpractice. Both theories were inextricably bound together in the asserted and established malpractice of McCabe.

The jury returned a verdict that McCabe was negligent in his treatment of Greenberg as a patient. That verdict constitutes Greenberg's sole claim against McCabe.

The provision in the policies limiting liability to $250,000 for "each claim or suit" applies to Greenberg's claim; she does not have a separate claim against McCabe for each year the policies were in effect or for each theory of liability.

## V. Conclusion

### A. Procedural Status of the Case

By Orders of June 24, 1980 and August 22, 1980, the court bifurcated the proceedings in this case into two phases. The first phase relating to coverage under the insurance policies includes resolution of the issues raised in plaintiff's complaint, defendant Greenberg's counterclaim, Count I, and defendant McCabe's amended counterclaim, Count VI. The remaining issues relating to Aetna's good faith in defending McCabe, raised by the remaining counterclaims, are to be dealt with in the second phase of the proceedings. The motions for summary judgment presently before the court have been considered with regard to coverage issues only; issues pertaining to the second phase remain to be considered. It may be that these issues can be resolved by summary judgment, but whether or not there are disputed facts material to Phase II should be separately addressed in view of the court's rulings on Phase I. The court will also hear counsel on whether, if there are facts in dispute material to defendants' claims for recovery beyond the policy coverage, the necessary factual determinations should be made by trial to a jury or to the Court.

---

16. *See also, Pioneer Nat'l Title Ins. Co. v. Andrews,* 652 F.2d 439 (5th Cir.1981) (attorney who prepared three improper certificates of title committed a single, continuing act of malpractice which gave rise to a single claim under insurance policy limiting liability to $100,000 for each claim). *But cf. St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guaranty Co.,* 637 P.2d 1146 (Haw.App.1981) (three separate claims arose where on three occasions insureds' negligently administered anesthetic to patient, which contributed to his death).

17. The Court has considered the cases involving whether fidelity bonds provide for cumulative liability or single continuous liability. *See, e.g., Aetna Casualty & Surety Co. v. First Nat'l Bank,* 103 F.2d 977 (3d Cir.1939); *Exchange Bldg. Ass'n v. Indemnity Ins. Co.,* 338 Pa. 562, 12 A.2d 924 (1940); *Bradley v. Fidelity & Casualty Co.,* 141 Pa.Super. 85, 14 A.2d 894 (1940). These cases, however, are inapposite because resolution of the limit of liability issue in this case turns on the particular language of the policy limiting coverage for "each claim or suit."

For the above reasons, defendants' motions for summary judgment are granted in part and denied in part as follows:

1. The motions are granted in that Aetna is not entitled to a declaration of noncoverage under its policy with McCabe, either on the ground that McCabe's conduct was not conduct "arising out of the rendering of or failure to render during the policy period, professional services," or, on the ground that McCabe's conduct was intentional. Partial summary judgment will be entered in favor of defendants and against plaintiff.

2. Defendants' motions for summary judgment are denied in part because:
   a. Aetna is not liable for punitive damages under the policy.
   b. Aetna is liable for $250,000, the limit of liability for one claim under each of the policies in effect during the continuation of the tortious conduct, and not for $250,000 for each year during which the claim may have arisen.

Denial of defendants' motions on these grounds is without prejudice to Phase II of these proceedings on whether Aetna breached a duty of good faith to McCabe which renders it liable for the prior jury's award in excess of policy coverage.

### B. *Judgment and Second Phase of Proceedings*

Defendants are entitled to partial summary judgment on certain issues in Phase I of these proceedings; the form of the judgment must be considered. Greenberg, as an "interested person," was entitled to have a declaration of her rights in this proceeding, *Allstate Ins. Co. v. Stinger,* 400 Pa. 533, 163 A.2d 74 (1960), but she does not have standing to sue Aetna directly in her own right. "[I]n the absence of a statute or a policy provision on which such right may be predicated, a person may not maintain a suit directly against the insurer to recover on a judgment rendered against the insured." *Phila. Forrest Hills Corp. v. Bituminous Casualty Corp.,* 208 Pa.Super. 461, 222 A.2d 493 (1966). *See also Pacific Indemnity Co. v. Linn,* C.A. No. 79–699, slip op. at 10 (E.D.Pa. July 24, 1981); *Pettus v. Jones & Laughlin Steel Corp.,* 322 F.Supp. 1078 (W.D.Pa.1971). Greenberg has failed to establish that she has rights under a statute or the policy. Her entitlement will be not as a third party beneficiary of the insurance contract, but as a garnishor or assignee. *See, Ferguson v. Manufacturers' Casualty Ins. Co. of Phila.,* 129 Pa.Super. 276, 280, 195 A. 661, 663.

McCabe is entitled to summary judgment on his amended counterclaim, Count VI, but he may be entitled to the money only for the use of Gale Greenberg. McCabe remains personally liable on Greenberg's judgment until it is paid. He earns income as a practicing physician in California, N.T. 6–103, and may have personal assets as well; the court is not aware if his income or assets can or have been attached under California law or if Dr. McCabe has satisfied yet any portion of the judgment against him.

The court will defer entering partial summary judgment on Phase I until the parties have had an opportunity to be heard on the form of judgment to be entered, and whether it should be certified as final. The court will also set a schedule for proceedings on the second phase of this case.